**NOT FOR PUBLICATION**                                    [21, 22, 23, 24, 25]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
MONICA DEVINE,                          :
                                        :
            Plaintiff,                   :
                                        :          Civil No. 03-3971 (FLW)
            v.                           :
                                        :              **OPINION**
PRUDENTIAL INSURANCE COMPANY  :
OF AMERICA; JOHN HORSLEY,        :
Individually and in his official capacity as  :
a Representative for Prudential Insurance  :
Company, ABC ENTITIES/            :
CORPORATIONS (1-100); JOHN &    :
JANE DOES (1-100),                      :
                                        :
            Defendants.                  :
_____:

**WOLFSON, UNITED STATES DISTRICT JUDGE**

Before the Court are motions by Defendants, Prudential Insurance Company of America

("Prudential") and John Horsley ("Defendants"), for Summary Judgment, pursuant to Fed. R.

Civ. P. 56(c), as well as Plaintiff , Monica Devine's ("Plaintiff" or  "Ms. Devine") Motion for

Summary Judgment and Cross-Motion for Spoliation.   In her Complaint, Plaintiff alleges that

Defendants violated the New Jersey Law Against Discrimination ("LAD"), the Family Medical

Leave Act ("FMLA"), and intentionally inflicted emotional distress on her when they allegedly

reconfigured her office while she was on maternity leave.    Complaint at ¶¶ 6-46.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).  For the reasons

that follow, the Court finds that Defendants have met their burden and shown that no material

issues of fact exist to defeat their Motions for Summary Judgment, and further, that Plaintiff's

Motion for Summary Judgment must be denied because the facts do not support her claims.

Accordingly,  Plaintiff's claims against Defendants are dismissed.

## I.      PROCEDURAL HISTORY

On June 23, 2003, Ms. Devine, by way of her then attorney Gregory S. Schaer, Esq., filed

a three count Complaint against Prudential, Mr. Horsely, ABC Entities/Corporation (1-100), and

John & Jane Does (1-100) in the Superior Court of New Jersey, Monmouth County, Law

Division, alleging that Defendants had: (1)  violated the New Jersey Law Against Discrimination

by discriminating against Ms. Devine "on account of her gender/pregnancy"; (2) violated the

Family Medical Leave Act ("FMLA") by "failing to restore plaintiff to the same or equivalent

rights, benefits and working conditions as held by plaintiff prior to taking leave in a variety of

ways as set forth above"; and (3) intentionally inflicted emotional distress on Ms. Devine.

Complaint at ¶¶ 1-5; 37-46.  Ms. Devine seeks the following relief: (1) "back pay, front pay and

all other sums of money paid which would have been earned by plaintiff had she not been

discriminated against"; (2) "an award of compensatory damages for pain and suffering and any

other compensatory damages available under law"; (3) "punitive damages and any other

exemplary, punitive treble damages which are allowed by statutes pleaded herein"; (4) "an award

of reasonable attorneys' fees and all costs of court and interest herein"; (5) "an award of all relief

as allowed under *N.J.S.A.* 10:5-1 *et seq.*, 219 U.S.C. 2601, *et seq.*, or other applicable law,

including attorneys' fees and costs; (6) "any other award and equitable relief allowed by statute,

or pursuant to the equitable and just power of the Court to which plaintiff is entitled"; and (7) "an

award granting equitable relief in the form of a temporary restraining order and/or injunctive

relief." Id. at pp. 9-10.  On August 19, 2003, the case was removed from the Superior Court of New Jersey, to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1441.  Notice of Removal, dated August 19, 2003, at ¶¶ 6-7.

Sometime in 2005, Plaintiff's counsel made an informal motion to Magistrate Judge Tonianne J. Bongiovanni to amend Plaintiff's Complaint to assert a claim of spoliation. Prudential objected to Plaintiff's request on the grounds that Plaintiff's request "must be done formally," and that Prudential had made "significant effort . . . to provide Plaintiff with discovery, and that no efforts were made towards the spoliation of evidence by Defendant . . . ." Judge Bongiovanni's Order, dated December 7, 2005 (Dec. 7, 2005 Order).   On December 7, 2005, Judge Bongiovanni denied Plaintiff's informal motion and ordered "that Plaintiff may seek to set forth an adverse inference or other appropriate remedy during trial for alleged spoliation of evidence by Defendant."  Id.

Prudential moved for summary judgment on September 8, 2006, claiming that Ms. Devine's Complaint should be dismissed because: (1) no genuine issues of material fact exist to warrant a trial; (2)   Ms. Devine's NJLAD claim fails because she "cannot show that Prudential caused the alleged discriminatory change in her office situation"; (3) "even if Prudential was somehow responsible for what transpired with respect to plaintiff's office situation, plaintiff cannot show that she actually suffered an adverse employment action"; (4) Ms. Devine "cannot show that Mr. Chapman was similarly situated to her"; (5) Ms. Devine's "claim of constructive discharge must be rejected, because, as a threshold matter, she cannot establish that Prudential subjected her to unlawful discrimination"; (6) Ms. Devine's FMLA claim "must be dismissed because she failed to return to work at the end of 12-week FMLA leave and, thus, as a matter of

law, the statutory protections expired"; (7) even if FMLA's protections "did not expire, plaintiff's office space was, at best, a 'de minimis' aspect of her job and, therefore, the FMLA requirement that she be returned to the same conditions of employment did not extend to this aspect of her job"; (8) Ms. Devine's claim for intentional infliction of emotional distress fails "because the record does not contain the extreme and outrageous conduct necessary to establish an intentional infliction of emotional distress."  Prudential's Brief in Support of its Motion for Summary Judgment, filed September 8, 2006 ("Pru. Br."), at pp. 2-5.

Mr. Horsley joined Prudential's motion and moved for summary judgment as well.  In addition to Prudential's legal arguments, Mr. Horsley argued that summary judgment was appropriate because: (1) he "is not subject to individual liability under the FMLA"; and (2) he "is not subject to individual liability under the NJLAD."  Horlsey's Brief in Support of his Motion for Summary Judgment, filed September 8, 2006 ("Horsley Br."), at pp. 2-3.

On September 8, 2006, Plaintiff also moved for summary judgment.   In that motion, Plaintiff, inter alia, seeks a dismissal or default judgment based on Prudential's alleged "spoliation of evidence for willful conduct."  See Plaintiff's Brief in Support of her Motion for Summary Judgment and for Spoliation of Evidence, dated September 8, 2006 ("Pl. Br.").  Then, on September 21, 2006, Plaintiff filed a Cross-Motion for Spoliation of Evidence.  In this Motion, Plaintiff again sets forth the facts she alleges support her allegations in the Complaint and again asks the Court to grant default judgment against the Defendant for allegedly failing to produce documents and email communications that allegedly reveal Plaintiff's concerns that her private office space was being taken over by David Chapman.  Plaintiff's Cross-Motion for Spoliation, dated September 21, 2006 ("Pl. Cross-Motion"), at 4-5.

II.     FACTS

A.      Office History and Relationship with John Horsley

In 1996, Plaintiff, Monica Devine began her employment with Defendant, Prudential

Insurance Company of America ("Prudential"), as a Sales Representative/Insurance Agent at

Prudential's Matawan District Office, located at 750 Route 34 in Matawan, New Jersey

("Matawan Office").[1]  Complaint at ¶ 6.  According to Ms. Devine, she "was the last agent hired

with Prudential to receive a book of business," and she "replaced an eighteen year veteran."

Devine Dep. at 105:5-8.  Ms. Devine maintained the veteran's book of business "and developed

new clients and leads and sales from there."  Id. at 105:5-9.  While working in the Matawan

Office, Ms. Devine did not have her own, personal office.  Id. at 112:12-17.  Rather, Ms. Devine

worked out of a cubicle that was not enclosed.  Id. at 112:12-17.  Sometime in 1998 or 1999, the

Matawan Office closed, and as a result, Ms. Devine relocated to another Prudential District

Office located in Oakhurst, New Jersey ("Oakhurst Office").   Complaint at ¶ 7.  However, prior

to the Matawan Office closing and sometime during 1998/1999, Ms. Devine testified that she

began to use Defendant John Horsley's private office at 740 Route 34 in Matawan, New Jersey

("740 Office" or "Horsley's Office")[2] to see her clients and only used her cubicle at the Matawan

Office "to report" on "reporting days."  Devine Dep. at 127:25-128:17.  Ms. Devine's client files

and file cabinets were located at the Matawan Office, and she also maintained a telephone there.

---

[1]750 Route 34 is owned by B&R Holding Co., a company owned by Defendant Horsley's
father-in-law, Russell Weber.  Plaintiff's Reply Declaration to Defendants' Material Facts, dated
September 28, 2006, ("Pl. Reply Decl."), at ¶¶ 12, 16, 18; see also Affidavit of John J. Peirano,
Esq., dated September 7, 2006 ("Peirano Aff."), at Ex. F.

[2]740 Route 34 is owned by B&R Realty, a company owned by Defendant Horsley's
father-in-law, Russell Weber.  Pl. Reply Decl. at ¶¶ 12, 16, 18; see also Peirano Aff. at Ex. F.

Id. 136:25-138:6.

_____At her deposition, Ms. Devine testified about the process an agent goes through to obtain her own, private office space:

> Prudential has very strict compliance rules on being able to go out and get your own office space or to operate from someplace other than Prudentially approved offices, I was looking to do something like that, but at that the [sic] time couldn't afford it, I would work with John Horsely [sic] on cases and we would go out and see clients and I would do the follow-up at Jonathan Horsley's office space down there, Steve Kaczala was down there, I had worked a few cases with Steve Kaczala, as well, but when I was down there, it wasn't my office space, meaning it didn't say 740 on my business cards or my laptop.

Id. at 132:20-133:8.

During this time, Ms. Devine's use of Mr. Horsley's Office was "unofficial", but when the "Matawan [office] closed and Oakhurst opened, [Ms. Devine] moved [her] files to 740, not to Oakhurst, with the approval of Rich Brandeis," who was her "district manager" at that time. Id. at 132:18-133:19. However, because Ms. Devine was not officially working out of Mr. Horsley's Office, Ms. Devine's address on her business cards and laptop did not reflect that she was working out of the 740 Office. Id. at 133:6-8.

According to Ms. Devine, she did not obtain official permission to work out of Mr. Horsley's office until August 2000, and in November 2000, "Pru corporate" gave Ms. Devine "official permission" to work out of Mr. Horsley's office and sent her a new agent office package. Id. at 133:20-134:25. The package contained a VHS tape and included all the procedures the agent had to follow at the private office. Id. at 134:10-14. Thus, although she "had been operating out of" Mr. Horsley's Office "for quite some time before," Ms. Devine's

6

move to Mr. Horsley's Office did not become "official" until January 1, 2001.  Id. at 134:10-19.

When Ms. Devine began using Mr. Horsley's Office, the office consisted of "a reception area with two desks and the bathroom and there was three private offices with doors." Id. at 139:17-20.  One of the private offices "was maintained as the lunchroom," another office was occupied by Steve Kaczala, and John Horsley occupied the other office.  Id.. at 139:21-23. During this time, Ms. Devine did not occupy an office.  Rather, she "worked at the front desk . . . while Steve and Jonathan were both there . . . ."  Id. at 139:24-140:1.  While working at the front desk in the reception area, Ms. Devine would use the offices of Kaczala and Horsley or the lunchroom to meet with her clients.  Id. at 140:2-5; 196:25-197:5.   In 2000, when "Steve retired, Jonathan took his [Kaczala's] office because it was bigger," and Ms. Devine "went into the lunch room because it was the smallest of the three, and then Dennis Hahn came in and took the third office."  Id. at 140:2-5; 196:25-197:5; 200:6-9.  Although Ms. Devine now moved her desk to the lunch room, the space was still used as a lunch room in that the refrigerator, eating table, microwave, water machine, and coffee pot remained in the room.  Id. at 200:19-203:18.

While working out of the 740 Office, Ms. Devine would spend approximately twenty to thirty percent of her time in the office and the rest of her time out of the office at client appointments.  Id. at 109:6-19.  In fact, Ms. Devine's time in the office "streamline[d] to twenty [percent] when we [Prudential employees] received the laptops and we were able to do all that stuff at the clients."  Id. at 109:19-21.

During this time, Ms. Devine did not pay Mr. Horsley rent.  Instead, Ms. Devine was "bartering" with Mr. Horsley for her space at the 740 Office.  Id. at 160:2-5.  In return for Mr. Horsley providing Plaintiff  the space she used in his office, Ms. Devine provided Mr. Horsley

with secretarial/marketing assistance.  Id. at 247:25-250:4; 290:11-292:4.  Specifically, Ms.

Devine testified:

> A    Yes.  John needed a marketing assistant and, at the time I first started with him, couldn't afford to hire one, and I wanted my own office space.  And it worked out well.  I handled servicing his clients in his absence, preparing for appointments, making the appointments, doing lead lists.  It eventually went into where I was handling his personal finances as well.
>
> Q.   And you're saying that that was in lieu of paying rent?
>
> A.   At the time, yes.  I was not officially in the office at that time either.
>
> Q.   So when did this barter system initially commence?
>
> A.   1999, I believe.
>
> Q.   Okay.  And did there come a time that you ceased to proceed under the barter system?
>
> A.   Well, it went back and forth depending.  Once I became official, in Prudential's eyes, to get the approval in there – which I think was March of 2001 and Dennis was already there – it came a point where the rental reimbursement program came in.  It freed me – I was actually banking time with John and paid rent while rental reimbursement was taking care of it with me.
>
> Q.   But prior to this rental reimbursement program, in your view you were under some sort of a barter system?
>
> A.   Yes, and in his view as well.
>
> Q.   Let's not speak to what his view was.
>
> A.   Well, he speaks to it in his deposition.
>
> Q.   Now in terms of this barter system, was it ever reduced to

8

writing?

A.    No.  We were great friends.[3]

Id. at 290:14-291:23.  It is undisputed that Mr. Horsley was not Plaintiff's superior or supervisor during any time that Ms. Devine was employed with Prudential, and further, Mr. Horsley did not have the responsibility to evaluate Ms. Devine's work.  Id. at 119:20-120:24.

In January 2001, Ms. Devine entered into a written lease with Mr. Horsley for office space  at the 740 Office.  Id. at 159:17-160:2.  Pursuant to the lease, Ms. Devine's rent was $350.00 per month.  Id. at 171:9-16.   Ms. Devine conceded that the only reason she entered into a written lease with Mr. Horsley was so that she could be reimbursed by Prudential under its "rental reimbursement program."  Id. at 159:17-160:2; 148:19-23.  Prudential initiated its rental reimbursement program sometime in the beginning of 2001 after the Oakhurst Office closed.[4]  Id. at 151:9-11.  The Oakhurst Office officially closed on March 14, 2001; however, "everybody was out of there by then."  Id. at 166:20-167:2.  The program was designed to compensate employees who were displaced as a result of the Oakhurst Office closing.   In order to be reimbursed under this program, Prudential required an employee to have a written lease.  Id. at 148:19-150:1. Further, the "lease for that program had to be something that was started new"  – meaning, "if you were already in a private office you were not eligible for the rental reimbursement, it had to

_____

[3]Ms. Devine admits that she and Mr. Horsley "were fast friends who were intended to trust each other."  Reply Declaration of Plaintiff to Dispute Material Facts of Defendants, dated September 28, 2006, ("Pl. Reply Decl"), at ¶ 13.  In fact, Ms. Devine "was referred to as Horsley's office wife," and Ms. Devine and Mr. Horsley "socialized together outside of work." Id.  Further, Mr. Horsley and his wife attended Ms. Devine's wedding.  Id.

[4]When the Oakhurst Office closed, the District Office "consolidated to Laurence Harbor, which is just a few miles from 740 Route 34 . . . ."  Devine Dep. at 156:3-9.

be because of the displacement" from the Oakhurst Office closing.  Id. at 151:13-17.  An

employee seeking reimbursement under this program "had one year from the time that the office

of Oakhurst closed, and . . .  you [did] not receive reimbursement for an entire year, you received

reimbursement for a dollar amount."   Id. at 169:22-170:1.  Ms. Devine's cap on the rental

reimbursement program was $2500.00.  Id. at 170:7-13.

      At her deposition, Ms. Devine testified about the 2001 written lease:

> In my eye it was an informal agreement, it was just for the
> reimbursement we had . . .  In my mind's eye, it was an
> informal agreement on why we had the leasing as opposed to
> a – I don't know if that makes sense . . .  It was like a – we
> were friends, John and I were friends, so it wasn't like I was
> signing a lease with somebody I had never met before or it
> was structured, it was like okay, it's this, we'll change it to
> this, it's not a big deal, you didn't have to go through the
> formality of doing a whole new lease is the point I'm trying
> to make very inadequately.

Id. at 171:20-172:15.  Between January 2001 and August 2001, Ms. Devine paid Mr. Horsley

$2,100.00 in rent for space at the 740 Office. Id. at 322:7-323:6.[5]  Although she only paid Mr.

Horsley $2,100.00 in rent, Ms. Devine received her full $2,500.00 rental reimbursement from

Prudential pursuant to its rent reimbursement program.  Id. at 323:12-324:16.  Contrary to Ms.

Devine's testimony, Mr. Horsley testified that the $2,100.00 he received from Ms. Devine was

not for rent, but he was unable to recall why Ms. Devine paid him $2,100.00 – although he

testified that Ms. Devine's payment could have been reimbursement for tuition for a class they

_____

[5]Defendant's Exhibit D-12 is a two-page copy of two checks, one check is in the amount
of $1,000.00 and the other check is in the amount of $2,200.00.  Ms. Devine testified that the
$2,200.00 check comprised her payment to Mr. Horsley of $2,100.00 for rent and $100.00 to
reimburse him "for crap he bought at Staples."  Devine Dep. at 323:2-7.  Ms. Devine cannot
remember the reason for her payment of $1,000.00 to Mr. Horsley.  Id. at 323:7-11.

took together.  Horsley Dep. at 26:10-27:1; 62:4-63:25.

After August 2001, Ms. Devine did not pay any monies to Mr. Horsley or anyone else for rent of her space at the 740 Office.  Rather, Ms. Devine testified that Mr. Horsley promised to "preserve" her office space while she was on disability leave because she had "banked" her time based upon the work she had done for him.  Devine Dep. at 687:25-689:5.  Further, according to Ms. Devine, Mr. Horsley promised to not let anyone have access to her office and also promised to maintain her files and her client's files.  Id. at 688:4-7.  Ms. Devine testified that she and Mr. Horsley entered into this agreement because "[w]e all knew I was going to get pregnant and I was going to be out."  Id. at 688:22-23.

According to Ms. Devine, she and Mr. Horsley entered into another written lease to cover the period from January 2002 to December 2002.  Id. at 161:21-25; 172:16-25.  Ms. Devine claims that this lease was executed sometime during the last week of October 2001 prior to her going out on disability leave.  Id. at 161:21-162:6.  Pursuant to this lease, Ms. Devine claims that her rent was decreased to $300.00 per month instead of $350.00 per month.  Id. at 173:2-11.  Ms. Devine did not have to submit this lease to Prudential "because the rental reimbursement program was over."  Id. at 173:12-16.  Ms. Devine never discussed this lease with her district manager, Michael "Mike" Marciano[6] nor did she personally submit the lease to him.  Id. at 175:2-11.  However, Ms. Devine testified that Mr. Horsley informed her that he had brought the lease to Michael Marciano at the same time that Ms. Devine's liability insurance was renewed. Id. at 175:12-176:7.  Ms. Devine claims that she kept a copy of this lease in her filing cabinet and

---

[6]Michael Marciano became Ms. Devine's District Manager at the end of 2000/beginning of 2001.  Devine Dep. at 123:4-124:13.  Ms. Devine testified that she only reported to Mr. Marciano.  Id.

11

that Mr. Horsley kept the original copy of the lease.  According to Ms. Devine, she was never able to retrieve her copy of the lease because when she returned from disability leave her filing cabinet "was in the basement of the main Webber Realty building and [she] never had access to it before leaving."  Devine Dep. at 159:17-160:2; 176:14-24; 177:20-178:2.  Other than Mr. Horsley, Ms. Devine did not personally show this lease to anyone else.  Id. at 178:3-5.

On October 18, 2001, Ms. Devine sent an email to Mike Marciano regarding the servicing of her clients during her leave:

> I have gone to great lengths to insure that my clients know they can be serviced by John [Horsley] in my absence and I would be very disappointed to find anyone else writing business off my debit in my absence . . .  My office machine will have a message indicating that John will be servicing my clients in any way needed and if the phone company gets it right, my line will then forward directly to John's office.

Id. at 312:3-314:20 (reading Defendant's Exhibit D-10, a three-page copy of e-mails, Bates stamped D0643-45).  At her deposition, Ms. Devine claimed that the above email implied that no one else would use her office while she was out in leave.  Id. at 313:4-17.   When asked where it is implied in the email, Ms. Devine testified:

> I just think the verbiage of the entire thing says how I have my entire office set up in my absence, and if you don't get the gist of how anal retentive I am be reading this email, you don't get a gist of it saying that John will be using my office.

Id. at 313:8-17.  However, after reading the email, Ms. Devine conceded that no where in this specific email did it state that no one would be using Ms. Devine's office while she was out on leave. Id. at 314:21-24.

On October 25, 2001, the day before Ms. Devine left for her disability leave, Ms. Devine sent an email reminding Mike Marciano of her leave and copied Charlie Gerardi and John Horsley on the email.  Ms. Devine also reminded Mr. Marciano that John Horsley would "be handling [her] clients service and insurance needs" while she was out on leave.  Ms. Devine wrote:

> Just following up . . . .
>
> You wanted me to remind you about sending a [sic] agency note detailing that John Horsley will be handling my clients service and insurance needs.
>
> Tomorrow is my last day : 0 ( . . . . . . and I know that you will miss the joy I bring to this company on a daily basis.
>
> If things go well . . . maybe I can come back prior to maternity leave . . . if not, I'll see you in the spring.
>
> Thanx . . Monica
>
> PS . .Please copy me on the note.

Pl. Reply Decl. at Ex. S at D0764.  Shortly after Ms. Devine's request, on October 25, 2001, Mr. Marciano sent the following email to Ms. Devine, with copies to Charlie Gerardi and Julie Fay, regarding Ms. Devine's disability leave and Mr. Horsley handling Ms. Devine's clients:

> Monica, Charlie Gerardi has informed his staff that you will be out and that your service and sales will be handled by John [Horsley].
>
> *          *          *
>
> Julie, please let everyone know that if a call for Monica gets to the agent of the day by mistake, that client/prospect should be referred to John H.
>
> Thanks.

13

Id. at Ex. S at D0764.

In addition to having Mr. Horsley service her clients while she was out on leave, Ms. Devine also gave Mr. Horsley the commissions on an annuity she had written for her client, Ms. Rooke. Devine Dep. at 558:21-559:9. She testified that she gave Mr. Horsley the commissions because when she learned she was going out on disability she knew that she was "no longer . . . obligated to meet Prudential's year-end requirement number," and Mr. Horsley, "of course, still was and was short, so I wrote the annuity and gave John the commissions. It was something [Ms. Devine and Mr. Horsley] did quite often." Id. at 559:3-8.[7] Ms. Devine testified about her conversation with Mr. Horsley concerning this annuity:

> Q.   Tell me about your discussion.
>
> A.   John, you're going to make year-end's numbers? I plan to. You want the commissions from the Rooke annuity? It would help. And pretty much along those lines.
>
> Q.   It's important for the case that I get everything you can specifically remember being said. Is that it –
>
> A.   It was –
>
> Q.   – or is there more?
>
> A.   Um, let me just think.
>
> Q.   Okay. Take your time.
>
> A.   It was along – the – the gist of it was that John would benefit from them for year-end numbers, which they did. It put him

---

[7]In a September 24, 2006 letter, Michael Marciano informed Mr. Horsley that Mr. Horsely was terminated because of Mr. Horsley's "private office arrangement with Monica Devine and the Mary Rooke annuity application." Plaintiff's Reply Declaration to Defendants' Material Facts, dated September 28, 2006, ("Pl. Reply Decl."), at Ex. BB.

at his numbers, and that I didn't need them and that I needed
to put him as the top agent on it so that he'd be able to access
it should she call in.  Otherwise, he would have to access it
through my information.  It made it easier for him to be on
it.

Q.      On the application?

A.      Yes.

Q.      Was the application sent to the home office before your visit
up to Ms. Rooke?

A.      I think so.

Q.      Okay.

A.      I explained to her that when she got the actual annuity, it was
going to say John Horsley, not Monica Devine, and I just
wanted her to be aware of that.

Q.      If the gist of it is all you can recall, that's fine, but if you can
recall certain statements or discussions between you and Mr.
Horsley about this topic, I'd like to hear them.  If you've told
me everything you remember, that's fine.  I'll move on.

A.      Just that he would benefit from the commissions and that he
was very appreciative of it.  He felt that I didn't need to do
anything more when it came time to pay rent for my second
lease or anything along those lines, but it wasn't discussed
as, you don't have to do this because you did this.

Id. at 559:9-560:20.  Mr. Horsley testified that consistent with this arrangement he received

commissions, and in return, he reimbursed plaintiff with payments from his personal checking

account totaling $3,000.00.  Contrary to Mr. Horsley's testimony, Ms. Devine testified that Mr.

Horsely never paid her commissions from the Rooke annuity; however, Ms. Devine

acknowledged that she received $3,000.00 from Mr. Horsley in January and February 2002.  Ms.

15

Devine testified that she assumed that Mr. Horsley's payment of $3,000.00 "was reimbursing [her] for money Dave [Chapman] paid for [subleasing her] office." Id. at 382:25-383:25; 672:3-22.

October 26, 2001 was Ms. Devine's last day of work before commencing her disability leave. Id. at 185:23-25. Prior to leaving the office, Ms. Devine gave her key to the office to Mr. Hahn's second marketing assistant because Ms. Devine "was heading out" and the assistant "didn't have a key." Id. at 728:25-729:9. The assistant never returned that key to Plaintiff.

On November 16, 2001, David Chapman emailed Mr. Marciano and requested a transfer to the outside office of Mr. Horsley and Mr. Hahn.[8] Mr. Chapman wrote:

> Mike,
>
> After being made aware of the office accommodations here in the Laurence Harbor office; I request a transfer to an established outside office of colleagues, 'John Horsley' and 'Dennis Hahn.' I would be able to work more effectively and efficiently from this location. Thanks
>
> [S]incerely,
> David Chapman

Pl. Reply Decl. at Ex. GG at 00654. On the same day, Mr. Marciano emailed Lisa Kent and requested "permission from Marty to allow [David Chapman] to move to existing private office occupied by FS Hahn and Rep Horsley." Id. at Ex. HH at 000656. On November 20, 2001, Mr. Chapman notified Mr. Horsley that his request for a transfer to Mr. Horsley's office had been

---

[8]In April 2000, Mr. Chapman expressed an interest in moving his office "to the established location of retired agent, Steve Kaczala, and fellow colleague, John Horsley. The office location to be: 740 [R]oute 34, Matawan, NJ 07747. Thank you." Pl. Reply Decl. at Ex. DD at 000761.

16

approved.  Id.  Mr. Chapman emailed Mr. Horsley: "Johnny, Green Light!"  Id.  On January 1,

2002, a lease between Mr. Chapman and B&R Holding Co. for Mr. Chapman's "general office

use" at the 740 Office was executed.  Affidavit of John J. Peirano, Esq., dated September 7, 2006

("Peirano Aff."), at Ex. F at D0532-34.  Pursuant to the lease, Mr. Chapman's rent was $400.00

per month.  Id.   The lease makes no reference as to what "general office" space Mr. Chapman

would use in the 740 Office.[9]  Id.

　　　While out on disability leave sometime in December 2001 or January 2002, Ms. Devine

alleges that she passed by the 740 Office on her way to the dentist, "who was located in the same

complex as her" office.[10]   Complaint at ¶ 22; see also Devine Dep. at 259:1-15; 728:1-13.

According to Ms. Devine, she "was shocked to see her office was being used by someone else,

and that person, David Chapman "had completely 'moved in.'"  Id. at ¶¶ 22, 25.  Ms. Devine was

"[e]xtremely upset" and "confronted Mr. Horsley who assured [her] that it was just a temporary

arrangement until her return to the office."   Id. at ¶ 26.   In response, Ms. Devine questioned Mr.

Horsley about her office, and he told her that he "was allowing another Prudential Agent, David

Chapman, to temporarily use Ms. Devine's office in her absence."  Id. at ¶ 23.  In addition, Mr.

Horsley told Ms. Devine "that he was planning a two (2) room addition to the office space and

intended on renting an office to Mr. Chapman upon its anticipated completion prior to Ms.

────────────────────

[9]On March 31, 2001, a lease between Dennis Hahn and B&R Holding Co. for Mr. Hahn's
"general office use" at the 740 Office was executed.  Similar to Mr. Chapman's lease, Mr.
Hahn's rent was $400.00 per month, and the lease made no reference as to what "general office"
space Mr. Chapman would use in the 740 Office.   Peirano Aff. at Ex. F at D0526-28.

[10]After giving birth on March 16, 2002, Ms. Devine never actually physically went back
inside to the 740 Office.  Devine Dep. at 260:1-21; 330:1-9.  In fact, the last time Ms. Devine
was physically inside the 740 Office was sometime in December 2001 or January 2002.  Id. at
728:1-13.

Devine's return to work."  Id. at ¶ 24.

In a December 27, 2001 email to Mr. Horsley, Ms. Devine complained:

> I am going to trust you against my better judgement [sic] and intuition because I really cannot afford any aggravation or stress at this point. I don't know why I am surprised at your obvious fondness for skating so close to thin ice, especially when it comes to me.  Rest assured that your overconfidence in my ability to forgive once again is misplaced. I am in a very critical stage of my pregnancy right now and can not/will not put myself in the position to come and remove my belongings from my office.  I made it clear weeks ago that if this is what you wanted you needed to tell me then, you chose the right decision and seemed sincere, please do not make me regret not bailing.
>
> I think you would beneflt [sic] greatly from deep thought and evaluation into the priorities, friendships and choices you make in your life.  Sit back and seriously think through some of the choices and decisions you have made recently.  Try to truly evaluate the consequences if all does not go perfectly.
>
> Lastly, stop pissing me off.

Pl. Reply Decl. at Ex. JJ at 000182.  In a December 30, 2001 email from Ms. Devine to Mr. Horsley,

Ms. Devine wrote:

> After my office visit Friday and a lot of thought this weekend I have come to conclusion that I need to come and pack my office.
>
> I hope to be there sometime before noon.  Once finished I should have approx. 3-4 boxes and the filing cabinet.  I can not take them off the premises as per PRU, I would like to move them or have them moved to the basement or tucked into a corner.
>
> Prior to my going out on DI we discussed in detail how my office would be handled.  As you know, [o]ne of the reasons I had no problem splitting the 6K in commissions was since I would be out, I would not be earning my [r]ent by "working for/with you among other things.  Its become painfully obvious that what I thought our agreement was and how you understood it differ a great deal.  I was extremely upset to see new phone lines being installed and someone

18

else's files being worked on.  I asked you weeks ago to make a
decision and tell me if you wanted to move things and you said no
. . . now that I am huge and suppose[d] to be stress free and off my
feet I have to come pack, exactly what I was trying to avoid doing this
far along.

You may think that Dave can work out front and Ron from your
office but you know damn well that will not work and eventually one
of them would end up in my office.  This way, it's free for you to do
as you choose.  I would like, in addition to the 800$ balance from the
split commissions, 1500$ more.  This represents 300 per month for
January through May 30th.  The balance of commissions that you
actually got to keep takes care of the 700 I owed and 300 rent for
Nov. and 300 rent for Dec.  We are both aware that the commission
credit you received did more than help you monetarily, it allowed you
to go statutory and guaranteed your bonus.  I[f] you don't feel this is
fair, let me know.  I could use the 800 now though.

Do not enter into a lease agreement for my space until you break the
lease Pru has on file for me or you wait until it expires.  It will only
get you in trouble.

My expected return date in [sic] June 1st, I guess we can cross that
bridge as the date draws closer.

I can't be bothered with worry of who is into what in my space
anymore and this is the only way I can be sure.  I know it is the right
decision for me right now.

Id. at Ex. JJ at 000183.[11]


On December 31, 2001 at 9:27 am, Mr. Horsley responded to Ms. Devine's email.

Mr Horsley wrote:

Monica,

I told you before, that is your office, no one will be using it.  Dave is
going to sit out front.  And Ron will be in my office.

---

[11]Ms. Devine sent this email a second time to Mr. Horsley on January 3, 2002 at 9:19 am.
Pl. Reply Decl. at Ex. JJ at 000183.

> The other day when you stopped in; the phone man had to use your phone jack to get to the front office for Dave.
>
> Dave will not have a phone jack in your office.  Dave is not going to be in your office.
>
> Relax, and think happy thoughts.
>
> Talk to you soon, or maybe not until next year ; )
>
> Me

Id. at Ex. JJ at 000640.  Less than twenty minutes later, Ms. Devine replied to Mr. Horsley's email and wrote:

> Bullshit . . . . .
>
> Lets do a hypothetical . . . . You and Ron in your office . . . you have a client . . . you need some privacy . . . lets see where will Ron go . . . . . . . . . the toilet, the waiting area . . now that's a professional looking office there I had interesting conversation with Dave Friday, I shouldn't have been so naive.  Get real [J]ohn. . and you know what, I don't want to be bothered with it anymore.  I have made up my mind, I will be up to pack my things.

Id.  Although in the above emails Ms. Devine wrote that she would come to the 740 Office to pack her office, she never returned to the office to pack her belongings; she also testified that she had no reason to believe that she was not permitted to go to the office and pick up her documents and belongings.  Devine Dep. at 339:4-19.  In fact, after her visit to the 740 Office in December 2001 or January 2002, Ms. Devine never entered the inside of the 740 Office again.  Id. at 728:1-13.  After Ms. Devine gave birth on March 16, 2002, all the dealings she "had with Prudential were out of the district office."  During this time, Ms. Devine went to the district office three times.  Id.

Sometime in April/May 2002, Ms. Devine spoke with Mr. Marciano, her District

Manager, and gave him a "heads-up" about her office situation.  Id. at 364:10-17.  However, Ms.

Devine did not ask Mr. Marciano to handle the situation or speak with Mr. Horsley.  Rather, Ms.

Devine testified that there was "no reason" for Mr. Marciano to get involved at that point.  Id. at

362:5-8.  Specifically, Ms. Devine testified:

> Q.    But you didn't specifically say, look, you've got to deal with
> this, Horsley's pissing me off?
>
> A.    I had no reason to at that point because I have had
> conversation [sic] with John and he's assuring me
> everything's fine.  They sent me a gigantic thing of flowers,
> can't wait 'til you come back.  I've got the card if you want to
> see it.
>
> Q.    Okay.
>
> A.    He had no reason to think I wasn't coming back to my office
> at that time, but I wanted to make sure that Dave was out and
> that's why I mentioned it to Mike.  I wasn't calling him to be
> like –
>
> Q.    Okay.  We can agree that you didn't tell Mike – you weren't
> complaining to Mike, you weren't telling Mike to do anything
> in particular?
>
> A.    Right.

Id. at 362:5-22; Complaint at ¶ 27.

Following the July 4th, 2002 weekend, Ms. Devine arrived at the 740 Office to begin her

first day of work.  Id. at 355:19-23.  Because Ms. Devine had previously lent her key to Mr.

Hahn's second marketing assistant, she did not have a key to enter the office.  Id. at 728:14-24;

728:25-729:9.  Mr. Horsley was away on a scheduled vacation[12] and the other agents were at a

_____

[12]John Horsley was on vacation from July 3, 2002 until July 10, 2002.  Pl. Reply Decl. at
Ex. OO.

sales convention.  Id. at 237:12-13; 238:7-9.  Plaintiff testified that she was aware that Mr. Horsley would be on vacation and that everybody else would be at a convention.  Id. at 237:12-13; 238:7-9.  In fact, Plaintiff testified that she "was anticipating coming back [to the 740 Office] and having a quiet time realizing everybody was going to be on conference and all" on her first day back at the office.  Id. at 238:7-9.  As a result of Ms. Devine lending her key to the assistant and everyone being out of the office, Ms. Devine was unable to physically enter the office.  She attempted to get a key from the landlord, Webber Realty, but it did not have one.  Id. at 237:8-16.  While locked out of the office, Ms. Devine looked through the window since "the blinds were up and all," and noticed that Mr. Chapman was still occupying the office and "nothing was changed."  Id. at 743:20-22.

Ms. Devine testified that Mr. Horsley had promised her throughout her disability leave that when she returned to work, Ms. Devine would return to her office and Mr. Chapman would work out of the office's reception area:

> Q.   Now, I know you've testified about this phone conversation that you had with Horsley before he went away on his vacation in July, and I think you testified earlier that up to that point, he was still saying that Chapman was going to leave the office?
>
> A.   Yes.
>
> Q.   Okay.  So when exactly, if at all, does he tell you, Chapman's not leaving the office?
>
> A.   He didn't really say anything.  I had come back.  You could see in, because the blinds were up and all, and nothing was changed.  And I'm like, what the – standing out there, no key.
>
> Q.   So he never specifically told you Chapman's not leaving the office?

A.   He told me over and over again that Dave would be out by the time I returned.  He would be out at the front desk.  He'd be out at the front desk.

It was a different story all throughout, because he had an addition planned in the office space and Dave was going to get one of those, and it was, you know, always something, but Dave would be out of my office in time for my return, and it never happened.

Q.   So at no time prior to July 19th [2002], when you submitted your resignation, did he ever say, Chapman's not going to move out of the office?

A.   No.

Q.   Okay.  So your understanding up to that point was that Horsley was going to kick him out of the office?

A.   Yes.

Id. at 743:11-744:18.[13]

Ms. Devine claims that to facilitate her return to work after July 4th, she attempted to find other private office space, but she could not find any.  Id. 353:2354:5.  However, Ms. Devine testified that although there was a desk available at the Laurence Harbor District Office, in Ms. Devine's opinion, it was an "unprofessional space" because it was not a private office space.  Id.

---

[13]Ms. Devine's testimony is in direct conflict with allegations in her Complaint. Paragraph 30 of Ms. Devine's Complaint states:

Upon confronting Mr. Horsley over the situation, Ms. Devine was told that there was nowhere to put Mr. Chapman and that the planned two-office addition to the suite had not been started as anticipated. Mr. Horsley told her that Mr. Chapman was staying where he was and that she had to accept that.

Complaint at ¶ 30.

at 307:11-308:16; 353:24:-354:9.

On Friday, July 19, 2002, Ms. Devine went to Mr. Marciano's office to speak with him regarding her issues with her office.  According to Ms. Devine, Mr. Marciano "wanted a week because he was going to try and fix it, fix the problem."  Id. at 358:14-21.  This conversation was the first time Ms. Devine "actually got to sit down" with Mr. Marciano and to inform him "how serious" she felt her issues concerning her office were.  Id. at 364:15-17.  However, rather than giving Mr. Marciano a week, Ms. Devine submitted her letter of resignation on Monday, July 22, 2002.[14]  Id. at 364:2-22.  Ms. Devine's resignation letter, dated July 22, 2002 read:

> TO WHOM IT MAY CONCERN:
>
> EFFECTIVE JULY 26, 2002 I RESIGN [sic] MY POSITION AS A REGISTERED REPRESENTATIVE OF PRUDENTIAL.
>
> I AM SENDING THIS LETTER AS PER MY CONVERSATION WITH MIKE MARCIANO THIS MORNING IN THE LAURENCE HARBOR OFFICE.  IT WAS MY UNDERSTANDING THAT I WAS TO HAVE MY EXIT INTERVIEW THIS MORNING BUT I NOW UNDERSTAND THAT A LETTER IS NEEDED TO START THE PROCESS THEREFORE MY LAST DAY WAS NOT JULY 19, 2002 BUT INSTEAD IS PUSHED TO JULY 26, 2002.
>
> I WENT OUT ON MATERNITY DISABILITY AND WHEN I RETURNED MY PRIVATE OFFICE IN A DETACHED PRUDENTIAL OFFICE WAS OCCUPIED BY ANOTHER AGENT. MY AGREEMENT WITH JOHN HORSLEY, HEAD OF THE PRIVATE OFFICE AND ALSO A PRUDENTIAL REPRESENTATIVE, WAS THAT UPON MY RETURN TO

---

[14]Ms. Devine's testimony is in direct conflict with allegations in her Complaint. Paragraph 36 of Ms. Devine's Complaint alleges that Ms. Devine "pleaded with Mr. Marciano to do something, indicating that these events had effectively rendered her incapable of performing her job."  Complaint at ¶ 36.   Ms. Devine alleges that "nothing was done to address [her] continued requests for assistance," and as a result, "she had no choice but to involuntarily resign and was constructively discharged on July 26, 2002."  Id. at ¶ 36.

> WORK I WOULD HAVE MY OFFICE AS IS [sic] WAS WHEN I LEFT.  THIS CAN BE CONFIRMED WITH JOHN HORSLEY.
>
> THE LAURENCE HARBOR OFFICE AND NEW BRUNSWICK OFFICE HAVE NO PRIVATE OFFICE SPACE AVAILABLE.

Peirano Aff. at Ex. N.

Ms. Devine and Mr. Horsley had liability insurance together with a policy period starting December 27, 2001 and ending December 27, 2002.  Devine Dep. at 220:4-17.  In fact, Ms. Devine was still on the liability insurance for the policy period, starting December 27, 2002 and ending December 27, 2003, even though she had not been employed with Prudential since July 2002.  Id. at 223:9-25.  Ms. Devine testified that she did not pay for the 2002-2003 coverage. Id. at 226:9-15.

On August 20, 2002, the Director of the Division of Unemployment Insurance notified Ms. Devine that she was entitled to unemployment benefits.  The notice read:

> YOU ARE HEREBY NOTIFIED THAT BASED UPON THE FACTS OBTAINED AND IN ACCORDANCE WITH THE NEW JERSEY UNEMPLOYMENT COMPENSATION LAW, THE DEPUTY (NAMED BELOW) [W. Keane] HAS DETERMINED THAT:
>
> YOU ARE ELIGIBLE FOR BENEFITS FROM 07/16/02.
>
> YOU LEFT YOUR JOB VOLUNTARILY BECAUSE OF THE WORKING CONDITIONS.  EVIDENCE INDICATES THAT THE CONDITIONS HAD A SUBSTANTIALLY ADVERSE EFFECT ON YOU.  YOU EXHAUSTED ALL AVENUES TO RESOLVE THIS SITUATION.   THEREFORE, YOUR REASON FOR LEAVING CONSTITUTES GOOD CAUSE ATTRIBUTABLE TO THE WORK.  YOU ARE ELIGIBLE FOR BENEFITS.

Pl. Reply Decl. at Ex. K at 000922.

**B.     Treatment of Disability Leave**

Ms. Devine had fertility treatments prior to conceiving twins, Id. at ¶ 63, and "in August 2001, Ms. Devine learned that she was pregnant with twins."  Complaint at ¶ 17.  From the beginning of Ms. Devine's pregnancy, she was classified as "high risk."  Pl. Reply Decl. at ¶ 9. During her pregnancy, Ms. Devine continued to work at the 740 Office; however, "[d]ue to complications that developed with Ms. Devine's pregnancy, she was placed on a medical disability effective October 30, 2001, with the intention of returning to work on or about May 29, 2002, six (6) weeks following her due date of April 26, 2002."   Complaint at ¶ 17.

On January 28, 2002, Pam Biggs sent Ms. Devine a letter regarding Prudential FMLA Services and enclosed a FMLA Preliminary Designation Form.  Pl. Reply Decl. at Ex. DDD at 0695-702.  However, according to a December 7, 2001 facsimile sheet from Ms. Biggs to Ms. Devine, Ms. Biggs sent the FMLA letter and Designation Form to Ms. Devine on November 1, 2001:

> Monica -
>
> Following is the paperwork I "mailed" to you at your home 11-1-01.
> As I was unsure of what Pauline gave you.
>
> The Health Care Provider Form is also in this paper work.
>
> Please follow instructions & send as directed on form.
>
> Feel good.
>
> Pam

Id. at Ex. DDD.

Ms. Devine delivered twins on March 16, 2002 by C-section, "approximately six (6)

weeks earlier than anticipated."  Id. at 785:22-25; Complaint at ¶ 20.  Mr. Horsley, Mr. Hahn, and

Mr. Chapman sent Ms. Devine "a gigantic thing of flowers" consisting of Ms. Devine's favorite

flowers – daises – to congratulate her on the birth of her children.  Id. at 362:8-12; 785:17-25.

The card on the flowers "said something like, Monica Mommy, can't wait until you come back to

the office;  Dennis, John, and Dave."  Id. at 362:8-12.

  An April 15, 2002 letter from Nia Taylor, Disability Claim Manager, to Ms. Devine

informed Ms. Devine of Prudential's Employee Disability Program.  Pl. Reply Decl. at Ex. DDD

at D0687-89.  That same day, Nia Taylor sent an email to Ms. Devine's supervisor Mike

Marciano (among others); Ms. Taylor lists Ms. Devine's "Disability Claim Status Information"

as:

> Date STD Disability Began: October 26, 2001
>
> Date STD Disability Ends: April 25, 2002
>
> Date LTD Disability Begins: April 26, 2002
>
> I am following up on the disability claim for Ms. Devine.  Effective 4/26/2002 this associate has been approved for Long Term Disability. Ms. Devine will be paid disability benefits through and including May 10, 2002.  Her claim will be terminated effective May 11, 2002.

Id. at Ex. I at 001064.

  In an April 16, 2002 email from Maureen McCormick to Charlie Gerardi, Ms.

McCormick explains Ms. Devine's disability status:

> Hi Charlie,
>
> This one is a little messy.  Internally, we need to code the time from April 26th through May 11th as an unpaid Maternity LOA [Leave of Absence].  The reason is that technically, when someone goes onto LTD, their employment with company is terminated unless their

employment is protected by an accomdation under ADA or some other kind of company-approved LOA.  Since this is a maternity situation, we obviously don't want to terminate her when she commences LTD. The reason I say that we "internally" code the time as also being part of the unpaid maternity LOA is that the system can only hold one code.  So systemically we can't note that she's on LTD and LOA.  (I know, it doesn't make any sense.)  So perhaps, if someone can note on her attendance sheet, or somewhere in her file that she was on LTD and concurrently on LOA, that would be great.  (Just so we have it documented.)

Also, Monica had advised Nia that she wants to use the two week Paid Parental Leave when her LTD expires.  So, your team should process that paperwork.  Monica didn't indicate what her plans were then – whether she'd be returning or taking more unpaid maternity leave. She should be contacting the office sometime within the next month to advise.

If you – or your team – have any questions, please give me a call.

Thanks.

Id. at Ex. K.

On April 17, 2002, Ms. Devine acknowledged that she had received notification from

Prudential that she was approved for Long Term Disability from April 26, 2002 to May 11, 2002.

Id. at Ex. I at 001069.  In an April 17, 2002 email from Ms. Devine to Prudential employees,

Pamela Biggs and Nia Taylor, with a copy sent to Prudential employee Maureen McCormick, Ms.

Devine wrote:

Today I received the letter stating I was approved for LTD [Long Term Disability] from 4-26 thru 5-11.  I am just confirming that from 5-12 thru 5-24 is when I receive the two weeks paid parental leave as per Nia.  I understand Nia contacted Maureen McCormick in re to this.  If for some reason this is incorrect, someone please contact me by phone at 732-780-9358.

28

> Pam & Nia, Yes I am released from the OB effective 5-11 but I am under the care of another doctor for complications thta [sic] hospitalized me and caused the emergency c-section.  I do expect to be released to return to work corresponding with the OB's date of release if all continues to go well.  Do I need to get a release from this doctor too?
>
> My Official date of return looks to be the 28th of May.
>
> Monica

Id.

In a May 2, 2002 email, Ms. Devine notified Mike Marciano and Pamela Biggs that she intended to take four weeks vacation after the termination of her Long Term Disability, and therefore, Ms. Devine requested that her return date to work be June 25, 2002.  Further, Ms. Devine informed Mr. Marciano and Ms. Biggs that Mr. Horsley would continue to service her clients while she was on vacation:

> Hello!
>
> All is well on my end so far . . . . . . .
>
> My expected return date is May 28th.  I would like to take my vacation time effective that date.  From my calculations I have at least 4 weeks time.  I believe I actually have 6 but I only want to take 4 weeks.  Please let me know if it is possible to take the 4 weeks effective 5-28-02.  This will bring my return date to 6-25-02.
>
> I have spoken with John Horsley and he is fine with continuing the servicin [sic] of my clients with any needs while I am out.  I believe it will maintain continuity as opposed to establishing my return with clients and then takin [sic] vacation time.
>
> Please let me know if this is okay and what I need to do to accomplish it. [I]s better to reach me by phone, I don't log on unless I have a client concern or can't reach you guys by phone.

29

Thanx for all of your help and support

Monica

Id.

In a May 3, 2002 email from Pamela Biggs to Maureen McCormick, with a copy to Mike Marciano, Ms. Biggs informed Ms. McCormick of Ms. Devine's request to take "4 weeks vacation once her paid parental leave has expired." Id. at Ex. K at 000191.  Ms. Biggs wrote that she and Mike Marciano did "not see a problem" with Ms. Devine's request.  Ms. Devine's request for vacation time was approved.

While Ms. Devine was on leave in 2001-2002, her compensation did not change, her benefits did not change, and her job title and description did not change.  Devine Dep. at 339:20-341:13; 343:10-14.  During this time, Ms. Devine was able to hook her "computer up to call clients" and "check her Lotus notes" email from her home.  Id. at 238:19-20.

C.    **Sexually Discriminating or Harassing Comments Made by Co-Workers**

Ms. Devine's deposition began on April 14, 2005, and lasted for 3 days.  At her deposition, Ms. Devine testified that the following facts support her claim that Defendants discriminated against her because of her gender and pregnancy:

> The facts are that I'm a woman who had a private office and went out on maternity leave and had twins.  I come back.  A man, who was not out on maternity leave, is now in my paid-for, private office, a man that would never have to go out on maternity leave and leave a space empty.
>
> I base it on the fact that a man who – I put my – he's a nice enough guy, but I put my character above Dave's [Chapman], because of his well-known background, and felt that was unfair.

\*          \*          \*

30

> Okay.  I feel that Dave was chosen by Prudential over me because he
> was a veteran, longer than I was there and had better producing
> numbers than I had there, and felt that he was a better choice.  If a
> choice was to be made on who was going to occupy that office in the
> end, then Prudential chose Dave over me because Dave's numbers
> were better than mine.  His personnel record may not have been better,
> but his numbers were better than mine.

Id. at 372:20-374:20.

Also at her deposition, but for the first time in this litigation, Ms. Devine accused her

male co-workers of making discriminatory and/or harassing comments to her.  Specifically, Ms

Devine claims that co-workers made the following comments:

> A.    The ability to breast-feed my kids and they'd be healthy,
> because my breasts were always a bone of contention with
> people, not only because of their size but apparently shifts in
> the office would make nipples appear and not appear.  So I was
> always the ongoing joke at Prudential because of my lack of
> control over that.
>
> So when the comment was made, boy, they'll be healthy twins
> and they'll be fed well, it came from an ongoing joke of my
> breasts.
>
> Q.    In this discussion, did anyone specifically mention your breasts
> other than to say the kids will be well-fed?
>
> A.    Say it?  No.
>
>                   *        *        *
>
> Q.    Well, did anybody make any gestures?
>
> A.    The look, they'll be well-fed.  They're not looking at my head
> when they're talking about that.  They're looking at my
> breasts.  I'm not feeding them from my ears.

Q.      So you were offended by the well-fed comment?

A.      Yes.

Q.      Did you tell them you were offended?

A.      Yes.

Q.      What did you say?

A.      Do you really think that's necessary?

Q.      Did you say anything else?

A.      That particular time, no.

                        *        *        *

A.      Okay.  My thing was – there was a lot of people that worked at
        Prudential, a lot of camaraderie.   There was a whole –
        everything – certain people stood out for certain things.  Mine
        was my breasts.  Mark Weiner was his toupee.  They bought
        him a Chi Pet, you know the Chi Pet can grow better hair.
        Cheryl Corbiscello's was her wide backside.

        So everybody had a thing that got picked on.  Was it annoying?
        Yes.  Did I hate it?  Yes.  Was it more so when I was
        pregnant?  Yes.  Did I say anything about it?  No.  I wanted
        just to get through my pregnancy and be done with it and, you
        know, be the big old team player and move on.

        But it was common.  Everybody who had the slightest thing
        different from anybody else, that's what they become known
        for.

Id. at 633:20- 634:8; 634:12 -634-25; 639:14-640:5.

        With regard to comments made specifically by Mr. Horsley, Mr. Hahn, and Mr.

Chapman, Ms. Devine testified:

Q.      Now let's talk a little bit about this issue with the breasts and

32

the nipples.  When was it that this issue first arose?

A.      The nipple part?

Q.      Whatever it was.

A.      It's two different things.

Q.      Then break it down for me.

A.      My nipples have a tendency of – or headlights, as they were called, come on and off on their own, and the comment would be made.

        But when I started the fertility --

Q.      Let's back up.  Did the nipple comments occur before the fertility treatments or after?

A.      Before.

Q.      And the comment was what?

A.      Headlights are on, must be cold.

Q.      Who said that?

A.      Whoever noticed it first in the office.

Q.      Do you have a specific recollection of who said that?

A.      I can honestly sit here and tell you that each of them has probably said it at lease once.

Q.      Name names for me please.

A.      Dennis [Hahn], John [Horsley], and Dave [Chapman].

        There was a client in one time and he had noticed it, and it was the joke.  I just went to my office.

Q.      So all this occurred before you began fertility treatments?

      A.     The nipples, as I was in John's office, yes, at the end of 2000 --

Id. at 640:17-641:25.  Further, Ms. Devine claims that Mr. Horsley, Mr. Hahn, and Mr.

Chapman questioned how she would be able to return to work after the birth of her children.

Specifically, Ms. Devine testified:

      A.     What was bothering me was, in my visits and coming back – you know, particularly for men, particularly John [Horsley], Dave [Chapman] and Dennis [Hahn], because I worked with them at one point in time – it was, oh, aren't you going to miss having – you have babies now.  You're going to be home.  Aren't you going to miss their first milestone?  Breast-feeding, what, are you going to have to pump 24/7 to feed them?  My children had some problems when they were born, so there were issues with that ongoing, who's going to take them to the doctor.

              And my comments back to Dave and Dennis in particular – because Dave had a little boy a few years before and Dennis, a little boy prior to that – why wasn't this affecting them?  Nobody was asking them any questions.  So in a way, it was being done like in a way like, you guys got to be kidding me.

              They were constantly ribbing, you know, you're going to miss the milestone, the mother's got to be there, all the first words, all the well visits.  My son, particularly, was in the hospital for a long time after me and my daughter were discharged.  How long it was going to be to leave them, being their mother, and you know, it was like they were questioning how productive I was going to be to this office now that I had the responsibility of twins at home.

      Q.     Okay.

      A.     Would I be bringing them in and sitting them in my seats in the office.  I had complications from my C-section, and was it going to be difficult carrying my computer and all that crap

around to appointments and moving things around.[15]

> I developed very bad preeclampsia during my pregnancy,
> which made my blood pressure very high.  And I, as you can
> tell, am very animated, as you can tell, and why put myself at
> risk if I have these complications and why does this just apply
> to me and not to men who've had children as well.  Why is it
> a woman's responsibility.  It's annoying, but it's a standard
> that goes unnoticed by men.

Id. at 377:21-379:13.  Prudential questions the validity of these allegations by noting that Ms.

Devine "did not make such allegations in her Complaint, filed in June 2003" nor did she "set forth

any of these allegations in her Answers to Interrogatories, served in January 2004, despite a

specific request for such information."  Defendant Prudential Insurance Company America's

Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, filed September 8, 2002

("Def.'s Undisputed Facts"), at fn 9.  Instead, Ms. Devine "waited until approximately 2.5 years

into discovery before she came forward with these allegations in her deposition."  Id.  Lastly,

Prudential finds it "telling that although Mr. Horsley was deposed before plaintiff revealed these

allegations at her deposition, Mr. Horsely was not questioned by plaintiff's counsel with respect to

any such alleged discriminatory comments."  Id.  In response, Ms. Devine blames her previous

attorney, Gregory S. Schaer, for failing to pursue these allegations.  Devine Dep. at 621:6-22.

However, Ms. Devine's current attorney, Wendy L. Elovich, Esq.,[16] deposed Defendant John

---

[15]Interestingly, Plaintiff's own statement reveals that while out on disability she was unable to perform the following job duties: "No lifting of computer bag or anything, need no stress, relaxation, bed rest."  Pl. Reply Decl. at Ex. J at Management Unit, Employee Statement, signed by Monica Devine on October 19, 2001.

[16]Ms. Elovich's Notice of Appearance in this action was filed with the Court on January 26, 2005.

Horsley on October 11, 2005, and failed to question Mr. Horsley about these allegations at his

deposition.  See Horsley Dep.

During her employment with Prudential, Ms. Devine was a member of a union.  Devine

Dep. at 97:9-98:10.[17]  Ms. Devine testified that the union had aided her in the past with regard to

two separate incidents.  Id. at 99:6-100:23.   However, Ms. Devine never complained to anyone

within her union about her issues with alleged pregnancy and gender discrimination.  Id. at 368:23-

369:6.  In fact, Ms. Devine did not even complain about any sort of discrimination to Roseann

Cruise, a Prudential employee, who Ms. Devine considered to be "more like a friend."  Id. at

368:23-369:6.  Significantly, it is undisputed that Ms. Devine did not complain to anyone in a

supervisory capacity about these allegedly harassing comments.

## III.     DISCUSSION

### A.     Standard for Summary Judgement Pursuant to Fed. R. Civ. P. 56(c)

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A fact is "material only

if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over

irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  The burden of

establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex,

477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must

set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  To do

---

[17]According to Ms. Devine, the union ceased to exist in the last year of her employment
with Prudential.  Devine Dep. at 98:11-18.

so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp., 477 U.S. at 324.  In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Ridgewood Bd. of Ed. v. Stokley, 172 F.3d 238, 252 (3d Cir. 1999).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party."  Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The motion is appropriately granted when that party is entitled to judgment as a matter of law. Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. V.I. 1990). Even if a record contains facts that might provide support for a non-movant's position, "the burden is on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment." Morris v. Orman, No. 87-5149, 1989 WL 17549, at *8 (E.D.Pa. Mar. 1, 1989) (citing Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988)); see also Atkinson v. City of Phila., No. 99-1541, 2000 WL 793193, at *5 n.8 (E.D. Pa. June 20, 2000).

### B.    Plaintiff's New Jersey Law Against Discrimination Claim Against Prudential

#### 1.    Prudential's Interest in the 740 Office

Prudential argues that "any action with respect to the space situation at the 740 Office

was not attributable to Prudential, and given that <u>all</u> of plaintiff's claims are based on the alleged change in her office situation, plaintiff's claims must be dismissed as to Prudential."  Pru. Br. at 11 (emphasis in original).  In support of its argument, Prudential relies on the following facts:

(1)    "there is no evidence that Prudential knew about the alleged barter arrangement prior to plaintiff's resignation";

(2)    there is no "evidence that Prudential management was involved in the alleged decision by Mr. Horsley to make the alleged change in the office situation";

(3)    "Prudential did not have any ownership interest in the building in which plaintiff worked";

(4)    Prudential did not "have any lease agreement with B&R Holding with respect to the leasing of the 740 Office or space therein";

(4)    "Prudential is not a party to any lease in which plaintiff may have been involved"; and

(5)    It is undisputed "that Prudential did not dictate or negotiate the terms of any of the lease agreements between any Prudential Sales agent and the owner of the 740 Office"; and

(6)    Prudential "could not prevent the owner from leasing space to Mr. Chapman (or any other Agent).

<u>Id.</u> at 10-11.

Plaintiff argues that "Prudential's Private Office Guidelines for Sales Professionals and the Managers Guide for regulating private offices show Prudential's rigid control of the approval,

authorization and operation of any Private Offices."  Pl. Reply Decl. at ¶ 9.  Further, Plaintiff

contends that:

> [a]ll of the depositions taken show in some way shape or form that
> Prudential had a large amount of control over any Private Office that
> wanted to operate under the Prudential Employer, including having
> Prudential named in a mandatory million dollar liability policy, and
> there was strict compliance and control over everything right down
> to the letterhead, signage, facsimile cover sheets and information
> brochures used . . . .

Id.  Lastly, Plaintiff contends that the two leases she entered into with Mr. Horsley were "delivered

to Mike Marciano's District Office with proof of [her] compliance to the $1,000,000 insurance . . .

."  Id.

Although most of the facts set forth by Prudential on the issue of the 740 Office, see pp.

37-38, supra, are undisputed, genuine issues of fact exist as to Prudential's oversight and

responsibility for the space at the 740 Office.  While there is no evidence that Prudential knew

about the alleged barter arrangement between Plaintiff and Mr. Horsley prior to Plaintiff's

resignation, Plaintiff testified that she did submit the 2001 lease she entered into with Mr. Horsley

to Prudential pursuant to its rental reimbursement program.  Further, Plaintiff testified that she was

reimbursed $2,500.00 pursuant to the program.  Second, email communications between Mr.

Horsley, Mr. Chapman, Mr. Marciano, and other Prudential employees reveal that Mr. Chapman

requested and needed approval from Prudential to transfer to the 740 Office, which he ultimately

received in November 2001.  Third, Ms. Devine testified that Prudential oversaw its employees at

their private, off-site offices and had inspections of said offices to confirm that all offices were in

compliance with Prudential's guidelines.  Thus, granting all inferences to Plaintiff on Defendants'

Motions for Summary Judgment, I find that there are issues of fact as to Prudential's responsibility for the 740 Office space.[18]  However, that does not end the inquiry.  Even if Prudential could ultimately be found responsible for the events relating to Plaintiff's office situation, the issue remains whether that situation constitutes an adverse employment action.

2.    <u>Adverse Employment Action/Similarly Situated Employees</u>

Under New Jersey's Law Against Discrimination ("LAD"),[19] to establish a <u>prima</u> <u>facie</u> case for discrimination, a plaintiff must show that she: (1) is a member of a protected group; (2) was performing her job; (3) suffered an adverse employment action; and (4) similarly situated persons outside her protected group were treated more favorably to give rise to an inference of discrimination.  <u>Geldreich v. American Cynanmid Co.</u>, 299 N.J. Super. 478, 489 (App. Div. 1997); <u>see</u> <u>also</u> <u>Leahey v. Singer Sewing Co.</u>, 302 N.J. Super. 68 (Law Div. 1996); <u>see</u> <u>Marzano v. Computer Science Corp.</u>, 91 F.3d 497 (3d Cir. 1996).  When evaluating a plaintiff's discrimination claim, the Court engages in the following three step process:

> (1) whether the plaintiff establishes a prima facie discrimination case;

---

[18]The Court notes that nothing in the record supports the contention that Prudential directed how the internal configuration of any of its agents' private offices would be made.

[19]The New Jersey Law Against Discrimination prohibits:

> an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, . . . to refuse to hire or employ or to bar or to discharge or require to retire . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

N.J.S.A. § 10:5-12 (2007).

(2) if so, the burden of production, not persuasion, shifts to the defendant to show a non-discriminatory reason for the decision;

(3) if the defendant meets this requirement, the plaintffi must show by a preponderance of the evidence that the non-discriminatory reason was pretext for discrimination.

McDonough v. Cooksey, No. 05-00135, 2007 WL 1456202, *3 (D.N.J. 2007)[20] (citing

Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1973); Tex. Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53

(1981).

Here, Plaintiff cannot satisfy her burden of establishing a prima facie case of discrimination

under LAD.  Although Plaintiff is a member of a protected group and was performing her job prior to

going on medical leave, and therefore, satisfies the first two prongs of the standard, Plaintiff's claim

fails because the facts, as viewed in the light most favorable to Plaintiff, do not establish Plaintiff

suffered an adverse employment action and that similarly situated persons outside her protected group

were treated more favorably.

An "adverse employment action" is established when the plaintiff shows that her

employer took a job action "'serious and tangible enough to alter [her] compensation, terms, condition

or privileges of employment.'"  Id. at 4 (quoting Cardenas v. Massey, 120 F.3d 251, 263 (3d Cir.

2001)).  In determining whether an employment action is "adverse" in gender discrimination cases,

---

[20]In McDonough, the plaintiff claimed violations under Title VII and the LAD.  However, the McDonough court's interpretation of Title VII discrimination violations is applicable to LAD discrimination violations.  McDonough, 2007 WL 1456202 at fn 2.  In fact, the New Jersey "Supreme Court has noted that, in construing the LAD, federal precedent governing Title VII is 'a key source of interpretive authority.'" Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 268 (App. Div. 1996) (quoting Lehman v. Toys 'R' Us, Inc., 132 N.J. 587, 600-01 (1993)).

courts must assess the action objectively and judge the action "based on a reasonable woman standard." Schott v. State, No. A-2612-04T1, 2006 WL 1911375, at *9 (App. Div. July 13, 2006), certif. den., 188 N.J. 577 (2006). The subjective feelings of an employee "are irrelevant in making that analysis." Id. Further, an employee's feelings that her job assignment is demeaning, does not render an employer's actions adverse "'merely because they result in a bruised ego or injured pride on the part of the employee.'" Id. (quoting Klein v. Univ. of Med. and Dentistry of New Jersey, 377 N.J. Super. 28, 46 (App. Div. 2005)). Similarly, "'not everything that makes an employee unhappy is an actionable adverse action.'" Id. (quoting Cokus v. Bristol Myers Squibb Co., 362 N.J. Super. 366, 378 (Law Div. 2002)). In fact, New Jersey Courts have found no adverse employment actions to exist when unhappy employees have been transferred to different departments and/or offices. Id. (A state judge's LAD claim was dismissed because a transfer from the Civil Division to the Criminal Division did not constitute an adverse employment action); see also Scott v. State, 143 Fed. Appx. 443, 446 (3d Cir. 2005) (the transfer of two corrections officers to other facilities did not constitute an adverse employment action where these transfers did not result "in a reduction in pay or status for either" officer).

Plaintiff claims that the change in her office situation was an adverse employment action. However, Plaintiff concedes that her compensation and job title did not change while she was on leave. Further, throughout her leave, Plaintiff had access to her computer and email from home. Although Plaintiff claims that her client files and personal belongings were in the basement of the 740 Office and she had no way of accessing them, Plaintiff has failed to point to any evidence to support these claims. Instead the record reflects that Plaintiff, in December 2001, made a request to Mr. Horsley that her 3-4 boxes and file cabinet be "moved to the basement or tucked into a corner." Pl.

42

Reply Decl. at Ex. JJ at 000183.   Further, Plaintiff never actually saw for herself if in fact her things were moved to the basement.  Devine Dep. at 336:19-24.   Rather, Plaintiff claims that Mr. Horsley told her that her file cabinet was in the basement.  Id.  Even assuming that Plaintiff's files and belongings were in the basement, Plaintiff testified that she had no reason  to believe that she was not permitted to go to the office and pick up her documents and belongings.  Id. at 339:4-19.  Plaintiff also claims that because Mr. Chapman was allegedly working in her office, her phone and fax lines were no longer connected.  However, Plaintiff's own testimony contradicts this claim.  Plaintiff testified that her office voicemail message explained to clients that she was out of the office and that Mr. Horsley would be servicing their needs "in any way needed," and "if the phone company gets it right," her phone line would be "forwarded directly to John's [Horsley's] office."  Id. at 312:3-314:20. Furthermore, despite Plaintiff's allegations, the record fully supports Defendants' claims that Defendants were looking forward to Plaintiff's return to the office and took all the steps necessary to insure that Plaintiff would be returning – including keeping Plaintiff insured under the liability insurance policy, maintaining her computer and email access, servicing  her clients, and most importantly, keeping her compensation and position the same as before she went on leave.

Even assuming that Mr. Chapman was going to remain in Plaintiff's office, and Plaintiff would be forced to work elsewhere, the transfer of Plaintiff's work space would not be considered an adverse employment action as the record reflects that Plaintiff's compensation, benefits, and job title would and did not change upon her return from leave.  Further, there is no evidence that Plaintiff's career would be adversely affected if she were no longer to have her office.  Prior to taking leave, Plaintiff's space at the 740 Office was the smallest of the three private offices and was used as a lunch room before Plaintiff moved her desk and belongings into that space.  However, even when

43

Plaintiff moved her desk to the lunch room, the space was still used as a lunch room in that the refrigerator, eating table, microwave, water machine, and coffee pot remained in the room.  Id. at 200:19-203:18.  Further, while using the converted lunch room as an office, Ms. Devine only spent approximately twenty to thirty percent of her time in the office and the rest of her time she spent out of the office at client appointments.  Id. at 109:6-19.  Although the alleged reconfiguration of the 740 Office may have bruised Plaintiff's ego and caused her to feel that Mr. Horsley was not grateful for all the assistance she had provided to him throughout the years, the Court simply cannot find that "a reasonable woman" in Plaintiff's employment situation would find Defendant's actions to constitute an adverse employment action under the LAD.

With regard to similarly situated persons outside of her protected group, Plaintiff claims that David Chapman was treated more favorably than she because he was given Plaintiff's office.  Plaintiff's claim fails here too.  In the context of discrimination cases, a "similarly situated" person "must be similarly situated in all material respects."  Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997).  First, Plaintiff conceded that she and Mr. Chapman are not similarly situated.  According to Plaintiff, Mr. Chapman was "a veteran" whose "producing numbers . . . were better than" hers.  Devine Dep. at 372:20-374:20.  Second, nothing in the record can support Plaintiff's claim that Mr. Chapman would be treated more favorably than she.  Rather, the record reveals that Mr. Chapman, if Mr. Chapman would have had to share an office with Plaintiff – an allegation of Plaintiff's – would be treated less favorably than Plaintiff upon her return from leave – particularly since he was paying $400.00  per month in rent.  Accordingly, the Court finds that Plaintiff has failed to establish a prima facie claim for discrimination under the LAD.

3.      Hostile Work Environment/Sexual Harassment

44

In her opposition to Defendants' Motions for Summary Judgment, Plaintiff claims that "[f]rom the time Plaintiff reported her pregnancy with twins had become a high risk, complicated situation, she confronted a sexually hostile work environment with the degree of severity or pervasiveness necessary to trigger a statutory violation."  Plaintiff's Opposition Brief, dated October 5, 2006 ("Pl. Opp. Br."), at 5.  In support of her allegations, Plaintiff cites to her deposition testimony where she testified that Mr. Horsley, Mr. Hahn, and Mr. Chapman made discriminatory comments regarding her pregnancy and breasts.

Plaintiff failed to allege these allegations in her Complaint.  In fact, her Complaint is devoid of any references to a hostile work environment or sexual harassment.  Rather, Plaintiff waited over 2 ½ years, until the second day of her deposition to make these allegations.  Equally troubling, Plaintiff never formally moved to amend her Complaint to add these claims – although she did informally move to amend her Complaint to add a claim for spoliation in December 2005.  Plaintiff contends that she made informal requests to Judge Bongiovanni regarding amending her Complaint to add this claim; however, Plaintiff concedes that her requests were made over 2 ½ years from the date the Complaint was filed.

Although the Court need not address these claims because Plaintiff failed to plead them, the Court finds that if the claims were plead they would not survive summary judgment.  Further, the Court finds that even if Plaintiff's motion were construed as a motion to amend to assert such claims, it would be denied pursuant to Fed. R. Civ. P. 15(c).  In order "to state a claim for hostile work environment due to sexual harassment" under the LAD, a plaintiff "'must allege conduct that occurred because of her sex that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive

working environment.'"   McDonough, 2007 WL 1456202 at *8 (quoting Lehman, 132 N.J. at

603).  LAD "is not a guideline for workplace civility," and therefore, "offensive comments or jokes

are not enough to state a claim for discrimination." Id. (citing Herman v. Coastal Corp., 348 N.J.

Super. 1, 20-23).  Similarly, "[a] supervisor that behaves in a cold, uncivil , inhospitable, or even

boorish way dos [sic] not engage in harassment so severe and pervasive." Id. at 9 (citing Shepherd

v. Hunterdon Dev. Ctr., 174 N.J. 1, 25-26 (2002)).  An employer is only liable for a hostile work

environment  "'if a plaintiff proves that management-level employees had actual or constructive

knowledge about the existence of a sexually hostile environment and failed to take prompt and

adequate remedial action.'"  Eiman v. Haworth, Inc., No. 91-1669, 1993 WL 86461, *7, fn 10

(D.N.J. March 12, 1993) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1486 (3d Cir.

1990)).

Employees are not guaranteed a "perfect workplace, free of annoyances and colleagues

she finds disagreeable."  Lynch v. New Deal Delivery Service, 974 F.Supp. 441, 452 (D.N.J.

1997).  Rather, "what is illegal is a 'hostile work environment' not an 'annoying work

environment.'"  Id.  In Lynch, the plaintiff, the employer's chief financial officer, alleged a hostile

work environment claim under the LAD.  Id. at 445-46.  In support of her claim, she cited to the

following facts:

- a stripper came to the office for a surprise performance to celebrate plaintiff's

  birthday.  The stripper was "instigated and arranged for" by the plaintiff's female

  co-workers, but paid for by the plaintiff's male colleague;

- comments made by a male colleague about the plaintiff's body and sex life;

- phone calls and numerous dinner invitations from the same, married male

colleague;

• the plaintiff was asked by her male colleague to fire "a female receptionist

because the receptionist was 'too pretty'";

• male colleagues making light of the sexual harassment complaints in the office;

and

• "Plaintiff having to handle the fallout from the harassing conduct" of another male

colleague.

Id. at 446-48; 451-52.

The Lynch court found that the plaintiff had to establish a LAD claim.  Id. at 452.  The

court found that "[s]exual harassment is more than an expression of taste," and employees are "not

entitled to a perfect workplace, free of annoyances and colleagues [they find] disagreeable."  Id.

Further, the court found that the incidents did "not rise to the level required to render a work

environment hostile and bring it within the purview of the NJLAD," as "no factfinder could

conclude that a reasonable woman in Lynch's position would feel that she was subjected to, and

affected by a work environment . . . that was so hostile as to alter the conditions of her

employment."  Id.

Similarly, in the instant case, Plaintiff's allegations that her co-workers[21] made comments

about her pregnancy and breasts do not rise to the level of "severe" and "pervasive."  First,

---

[21]Although Plaintiff claims in her summary judgment papers that Mr. Hahn was a field
supervisor, Plaintiff testified she only reported to Michael Marciano.  Devine Dep. at 123:4-
124:13.  See Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) ("when a party does not explain the
contradiction between the subsequent affidavit and the prior deposition, the alleged factual issue
in dispute can be perceived as a 'sham', thereby not creating an impediment to a grant of
summary judgment based on the deposition").

Plaintiff's own testimony reveals that there was mutual "ribbing" taking place in the office and that although she found the comments made about her pregnancy and breasts "to be annoying," she did not indicate that they had any tangible impact on her.  Devine Dep. 381:13-20; 639:14-640:5. Second, Plaintiff failed to complain to anyone during her tenure at Prudential about these comments.  Although Plaintiff attributes her silence to fear that Mr. Horsley would not continue to service her clients while she was on leave, Pl. Opp. Br., at 6, Plaintiff did not find these comments so offensive or pervasive that they dissuaded her from returning to work nor did she find it necessary to complain and seek assistance from the company upon her decision to return to work. Devine Dep. at 368:23-369:6; 381:13-20; 639:14-640:5.   Indeed, Plaintiff failed to mention the alleged sexual harassment in her resignation letter.  Third, Plaintiff waited over 2 ½ years after filing her Complaint to even make these allegations.[22]   Moreover, Plaintiff cannot establish that Prudential was liable for a hostile work environment because Plaintiff concedes that the alleged discriminatory comments were made only by her co-workers and Prudential did not have active or constructive knowledge of the comments because she never complained of them to management-level employees.

Therefore, the Court finds, as a matter of law, that these comments in the context of this case, were not so severe or persuasive as to alter the conditions of Plaintiff's employment or to create a hostile work environment.

4.      Constructive Discharge

A claim for "[c]onstructive discharge requires more facts and worse conduct than a

---

[22]The Court finds it difficult to believe that Plaintiff's attorney would not have amended the Complaint to allege Plaintiff's claims, or even question Mr. Horsley at his deposition about these allegations, if the behavior Plaintiff complains of was in fact so severe and pervasive.

discrimination complaint in order to state a claim under the LAD." McDonough, 2007 WL
1456202 at *10 (citing Shepherd, 174 N.J. at 28). "It is not enough that the defendant's conduct is
severe or pervasive; it must be 'so intolerable that a reasonable person would be forced to resign
rather than continue to endure it.' Intolerable conduct includes conduct that is 'outrageous,
coercive and unconscionable.'" Id. Therefore, even though a plaintiff "may meet the standard for
gender discrimination, it does not rise to the level of constructive discharge" unless the conduct
was "outrageous, coercive and unconscionable." Id. Thus, even if Plaintiff could survive summary
judgment on her gender discrimination claims, I find that she cannot satisfy the standard for
constructive discharge.

Further, in order to "state a claim for constructive discharge, a plaintiff cannot first quit
her job." Id. Rather, a plaintiff "'has an obligation to do what is necessary and reasonable in order
to remain employed rather than simply quit.'" Id. (quoting Woods-Pirozzi, 290 N.J. Super. at 276).
Therefore, if the trial court finds that an employer violated the LAD, the trial court "should . . .
consider the nature of the sexual harassment, the closeness of the working relationship between the
harasser and the victim, whether the employee has resorted to internal grievance procedures, the
responsiveness of the employer to the employee's complaints, and all other relevant
circumstances." Woods-Pirozzi, 290 N.J. Super. at 276 (citing T.L. v. Toys 'R' Us, Inc., 255 N.J.
Super. 616, 663 (App. Div.)), certif. den., 130 N.J. 19, (1992), aff'd as modified sub nom.,
Lehman, 132 N.J. 587.

In McDonough, the plaintiff alleged that although "she was 'most qualified' for the job,"
she had not been selected for a K-9 officer position because of her gender and because she had
filed a previous gender-discrimination suit against the defendants.   McDonough, 2007 WL

1456202 at *1.  The plaintiff claimed that "she was rejected for 'past jobs and opportunities' in favor of 'junior men,' was not told of intra-department opportunities, experienced continuous discrimination within the department, and 'had to get out' of the department when she was not selected for the K9 position.'" Id. at 2. Further, the plaintiff claimed that a co-worker had commented and mocked the plaintiff regarding her previous suit, and a sergeant "physically intimidated her by bumping her, and giving her less desirable assignments." Id.  Although the court found that the defendants' conduct "may meet the standard for gender discrimination, it [did] not rise to the level of constructive discharge" because "[n]othing Plaintiff endured could be considered outrageous." Id. at 10.

The United States Supreme Court found genuine issues of material fact to exist as to whether the defendants' conduct was "outrageous", in a case where the plaintiff, a former "police communications operator for the McConnelsburg barracks," was "subjected to a continuous barrage of sexual harassment that ceased only when she resigned from the force" by her three supervisors. Pennsylvania State Police v. Suders, 542 U.S. 129, 129 (2004) (plaintiff sued her former employer, the Pennsylvania State Police alleging "that she had been subjected to sexual harassment and constructively discharged, in violation of Title VII of the Civil Rights Act of 1964").  The allegations that constituted "outrageous" conduct included:

- the plaintiff's supervisor speaking about "people having sex with animals each time [the plaintiff] entered" the office;

- the plaintiff's supervisor stating that "young girls should be given instruction in how to gratify men with oral sex";

- the plaintiff's supervisor sitting close to the plaintiff wearing spandex shorts with

50

his legs spread apart;

- the plaintiff's supervisor repeatedly (5 to 10 times per night) making "an obscene gesture in [the plaintiff's] presence by grabbing his genitals and shouting out a vulgar comment inviting oral sex"; and

- the plaintiff's supervisors setting the plaintiff up, which led to the plaintiff being apprehended and handcuffed by the supervisors for allegedly stealing her computer-skills examinations.

Id. at 135-37.

Plaintiffs who leave their employment without doing what is "is necessary and reasonable in order to remain employed," cannot state a claim for constructive discharge. Woods-Pirozzi, 290 N.J. Super. at 276-77. In Woods-Pirozzi, the plaintiff was employed at Nabisco's Fair Lawn, New Jersey facility as the head nurse/medical supervisor. Id. at 260. Throughout her employment, the plaintiff was subjected to remarks about her sexuality, menstrual cycle, physical appearance, and health. Id. at 260-66. The plaintiff also witnessed a doctor examine a "female employee's vagina with no gloves on." Id. at 261. That same doctor also "implied to a Nabisco employee that plaintiff had the AIDS virus, which she did not." Id. at 263-64. In October 1991, the plaintiff "took a medical leave of absence" as a result of "various physical ailments . . . ." Id. at 265. The plaintiff's long-term disability ended April 1992; however, after April 1992, although "still technically employed by Nabisco," the plaintiff remained at home. Id. The plaintiff "resigned in December 1992, effective January 1993." Id. At first, the plaintiff claimed that she did not resign sooner "because her attorney (in a worker's compensation action against her prior employer) advised her to just stay on disability"; however, the plaintiff "also stated that she would not have

51

returned to Nabisco, even if her doctor and attorney had said that it was all right to because of the stress and 'situation of the job.'"  Id.  The court affirmed the dismissal of the plaintiff's constructive discharge claim because it found that "Nabisco did not knowingly permit discriminatory conditions so intolerable that a reasonable person subject to them would resign," Nabisco had already terminated the doctor involved and the plaintiff's supervisor was no longer assigned to the plaintiff, plaintiff's alleged "demotion" was not in retaliation, and more importantly, "[n]o rational jury could find that the conditions were so intolerable that [the plaintiff's] decision was reasonable given her obligation . . . not to simply quit . . . "  Id. at 276-77.

In the instant case, Prudential argues that Plaintiff's constructive discharge claim should be dismissed because: (1)  Plaintiff "cannot establish that Prudential subjected her to unlawful discrimination"; (2) "even if plaintiff could establish her discrimination claim against Prudential . . . her constructive discharge claim must be dismissed because she cannot show that Prudential 'knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign' and/or that any of the alleged conduct was 'outrageous, coercive and unconscionable'"; and (3) "[P]laintiff failed to 'do what is necessary and reasonable to remain employed.'"   Pru. Br. at 22-23; 25 (internal citations omitted).  Plaintiff, in her opposition brief to Prudential's  and Mr. Horsley's Motions for Summary Judgment, does not address Prudential's argument that she has failed to state a claim for constructive discharge. Rather, with regard to her LAD claim, Plaintiff focuses on the prima facie elements needed to establish her LAD claim, the fact that she had two leases for a private office at the 740 Office, and the alleged discriminatory remarks made to her by her co-workers.

The Court agrees with Prudential.  First, as the Court discussed above, Plaintiff has failed

to establish that she was subjected to unlawful discrimination under the LAD.  Second, Plaintiff has failed to establish that her conditions of discrimination in employment were so intolerable that a reasonable person subjected to the same conditions would resign.  Prudential made every attempt to accommodate Plaintiff during her leave.  Plaintiff received the benefits of short-term disability, long-term disability, Prudential's 2-week parental leave, and 4 weeks vacation.  Her salary and benefits did not change while she was out on leave, and further, her position and title remained the same.

With regard to the alleged comments made by Plaintiff's co-workers regarding her medical leave, pregnancy, and breasts, the Court finds that these alleged comments were not so intolerable as to create an intimidating, hostile, or offensive working environment.  Indeed, Plaintiff still wanted to return to work months after these comments were made and failed to report these comments to Human Resources or Roseann Cruise, her  friend and co-worker, even though she was in email correspondence with these individuals throughout her leave.  Third, Plaintiff has failed to allege conduct that was outrageous, coercive and unconscionable.  In fact, the record is devoid of any outrageous conduct.  Plaintiff testified that she and Mr. Horsley were "best friends," he "was ecstatic that [she] had gotten pregnant, and she was referred to as his "office wife."  Devine Dep. at 261:10-11; see also Pl. Reply Decl. at ¶ 13.   Moreover, Plaintiff conceded that Mr. Horsley, Mr. Hahn, and Mr. Chapman sent her a "gigantic" arrangement of her favorite flowers after she gave birth, and on the card attached to the flowers, they expressed that they were looking forward to her returning to the 740 Office after her leave.

Lastly, Plaintiff failed to attempt to rectify her office situation.  Rather than take Mr. Marciano up on his offer to wait a week to see if he could fix the situation, Plaintiff resigned.

Plaintiff conceded that she never actually physically entered the 740 Office to see what the working conditions would be like.  In fact, Plaintiff does not know if Mr. Chapman would have even been in the space she had previously occupied in the converted lunch room or whether her productivity would be affected if she had to share an office with Mr. Chapman or work out of the reception area.  The Court finds that no rational juror could find that the conditions of the 740 Office were so intolerable that Plaintiff's decision to simply quit before even seeing her office or providing Prudential an opportunity to accommodate her with space was reasonable.  Therefore, the Court finds that Plaintiff has failed to establish a <u>prima facie</u> claim for constructive discharge.

### B.    Plaintiff's FMLA Claim Against Prudential

The Family Medical Leave Acts provides that:

> any eligible employee who takes leave under section 102 [29 USCS § 2612] for the intended purpose of the leave shall be entitled, on return from such leave--
> (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
> (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 USCS § 2614(a).

In enacting the FMLA, Congress defines an "equivalent position" as:

> one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 CFR § 825.215(a).  Eligible employees under the FMLA are only "entitled to a total of 12 workweeks of leave during any 12-month period . . . ."  29 USCS § 2612(a).  Once an employee

has been provided with 12 workweeks of leave, the employer's obligations under the FMLA

expire.  See Id.; see also Cehrs v. Northeast Ohio Alzheimer's Research Center, 155 F.3d 775, 784-

85 (6th Cir. 1998) (when employee was unable to return to work after her 12 workweeks of FMLA

leave, the employer, who terminated the employee, was not liable for a FMLA violation); see also

Pert v. Value Rx, No. 96-73153, 1996 WL 1089866, *2 (E.D.Mich. Oct. 9, 1996) ("the plain

meaning of the statute is clear and unambiguous to this Court-an employee gets up to 12 weeks of

leave under the protection of the FMLA, nothing more and nothing less").

    A March 26, 1999 letter opinion from Michelle M. Bechtoldt, Office of Enforcement

Policy, Family and Medical Leave Act Team, U.S. Department of Labor, explains the FMLA's

effect on an employer's more generous employment leave plan:

> The FMLA (§ 29 U.S.C. 2652) and the Regulations (§ 29 CFR
> 825.700) describe the interaction between the FMLA and employer
> plans and provide that nothing in FMLA diminishes an employer's
> obligation under a collective bargaining agreement (CBA) or
> employment benefit program or plan to provide greater family or
> medical leave rights to employees than the rights established under
> FMLA, nor may the rights established under FMLA be diminished by
> any such CBA or plan.
>
> In your letter, you give an example of a more generous employment
> leave plan that permits an employee to take up to 52 weeks of
> medical leave and to return to work.  If the employee fails to return
> to work within the 52 weeks of medical leave, the employer may
> terminate the employee's employment.  You asked whether the
> employer can lawfully terminate an employee's employment if an
> employee has been on a medical leave of absence for 52 weeks with
> 12 of those weeks also designated as FMLA leave, or whether the
> employee, after 52 weeks of a medical leave of absence, would be
> entitled at that point to an additional 12 weeks of FMLA leave.
>
> In response to your question, we wish to note that the FMLA requires

covered employers to provide eligible employees with up to 12 workweeks of leave in a 12-month period for any one or more of specified family or medical reasons.  By its terms, FMLA requires unpaid leave, but also provides for the use of appropriate paid leave for any portion of the unpaid leave required by the Act.  (See § 29 U.S.C. 2612(d) and § 29 CFR 825.207.)  If the employee is unable to or does not return to work at the end of 12 weeks of FMLA leave (provided the employer designated the leave as FMLA leave and so notified the employee in writing), all entitlements and rights under FMLA <u>cease</u> at that time.  The employee is no longer entitled to any further job restoration rights under the FMLA.  (See § 29 U.S.C. 2612(a) and §§ 29 CFR 825.200 and .214).

An employer, however, must observe any employment benefit program or plan or CBA that provides greater family or medical leave rights to employees than the rights established by the FMLA.  (See § CFR 825.700.)  Thus, the employer in your example may have an obligation under its <u>own</u> "medical leave of absence" policies to extend leave benefits for up to 52 weeks, but not beyond 52 weeks.  If the medical leave of absence also qualifies as a serious health condition for FMLA purposes, the employer may designate 12 weeks of that absence as FMLA leave so long as the employee is eligible.  While the discrimination prohibition in FMLA (§ 29 U.S.C. 2615 and § 29 CFR 825.220) would prevent an employer from treating FMLA leave takers differently than it would treat similarly situated employees who were not eligible for FMLA leave, the FMLA would not require, nor prohibit, an employer to extend leave benefits beyond the 52 weeks.

The above information should be viewed as general guidance based upon the limited information contained in your letter.  If we may be of further assistance to you, please do not hesitate to contact me.

Pru. Br. at Ex. 4 (emphasis in original).

In <u>Pert</u>, the plaintiff, returned to work "14 weeks and 6 days after her leave commenced.

Upon her return to work, the plaintiff was placed in a new position, although given the same pay

and benefits of her previous job.  Plaintiff voluntarily quit five months later . . . ."  <u>Id.</u> at 2.  The

defendant contended that it was entitled to summary judgment and the plaintiff's complaint should

be dismissed because plaintiff failed to allege that she "returned to work within the 12 week

period." Id. at 4-5. The plaintiff claims that "the defendant employee's handbook created an

extension of the FMLA under the defendant's own separate leave policy" because "by mentioning

the FMLA and then mentioning their own separate leave policies, the defendant incorporate the

protections of the FMLA into those separate policies." Id. at 5. In support of her argument, the

plaintiff relied on § 2652(a) of the FMLA:

> Nothing in this Act or any amendment made by this Act shall be
> construed to diminish the obligation of an employer to comply with
> any collective bargaining agreement or any employment benefit
> program or plan that provides greater family or medical leave rights
> to employees than the rights established under this Act or any
> amendment made by this Act.

Id. at 5-6. The Pert court found "no support for plaintiff's position nor with [her] strained

interpretation of section 2652 quoted above." Id. at 6. Further, the Court found the plaintiff's

reliance on section 2652 to be "misplaced," and moreover, the Court noted that section 2652 "does

not refer to an employer extending the leave provisions of the FMLA, but," instead, the language

is: "Merely a truism which emphasizes that employers are legally bound by valid contractual

agreements made with their employees regarding employment benefits. An employer's contractual

obligations are distinct, however, from . . . the FMLA itself." Id. at 6-7. Accordingly, the court

granted defendant's motion for summary judgment because "the plaintiff's leave extended beyond

the 12 week statutory period," and thus, "plaintiff relinquished FMLA protection." Id. at 7-8.

In the instant case, Defendants claim that Plaintiff, similar to the plaintiff in Pert, is not

entitled to the protections of the FMLA because "plaintiff did not return to work until more than

<u>five</u> months <u>after</u> her FMLA leave expired, and therefore, "plaintiff's claim that Prudential violated

the FMLA should be dismissed." Pru. Br. at 27-29. Specifically, Defendants claim "that on or

about October 30, 2001, plaintiff went on FMLA leave from Prudential, and on or about January

30, 2002, plaintiff's 12 weeks of FMLA leave expired." <u>Id.</u> at 28. In opposition to Defendants'

argument, Plaintiff claims her FMLA leave began "4 weeks before her delivery and 8 weeks

thereafter." Pl. Opp. Br. at 8. Further, Plaintiff claims that she "had pre-approved medical and

family leaves to remain out of work through May 29, 2002," and after May 29, 2002, Mr.

Marciano's subordinate, Julie Fry, recommended to Plaintiff to utilize her 4 weeks accrued

vacation time, which Marciano approved again." <u>Id.</u> at 10. Therefore, Plaintiff did not return to

work until after the July 4th 2002 weekend – meaning, Plaintiff took over eight months of leave.

Devine Dep. at 355:19-23. Plaintiff next argues that if she was no longer protected under

the FMLA, Prudential "<u>had to notify Plaintiff</u> of her obligations or any failings on her part to

correct her situation. There is absolutely no documentation sent to Plaintiff to warn her she does

not have protected status, any longer. Further, there is no documentation to refute Plaintiff's

ongoing 'protected status.'" <u>Id.</u> at 10 (emphasis in original).

  The Court finds that pursuant to the FMLA, Plaintiff was only entitled to 12 workweeks

of FMLA protection. Assuming that Plaintiff's timetable and inferences regarding her leave are

correct, Plaintiff's FMLA would have started on February 16, 2002 – 4 weeks before the birth of

her twins on March 16, 2002 – and ended on May 11, 2002 – 8 weeks afer the birth of her twins.

Therefore, by the time Plaintiff returned to the 740 Office after the July 4th weekend, she was no

longer protected under the FMLA. With regard to Plaintiff's argument that Prudential had a duty

to inform her that she was no longer covered under the FMLA, the Court notes that Plaintiff has

presented no case law to this Court that an employer is required to give an employee notice that her

entitlement under the FMLA would expire.  The Pert court found that an employer "went beyond

the requirements of the FMLA by voluntarily informing the plaintiff that if she took the extended

leave she requested her entitlement under the FMLA would expire."  See Pert, 1996 WL 1089866

at *7-8.  Moreover,  the March 26, 1999 letter opinion from Michelle M. Bechtoldt, Office of

Enforcement Policy, Family and Medical Leave Act Team, U.S. Department of Labor, which is

attached to Prudential's Brief in Support of its Motion for Summary Judgment, does not suggest

that employers have a duty to inform employees when their FMLA would expire, but employers

simply must designate the FMLA leave as such and so notify the employees.  See Pru. Br. at

Ex. 4 ("If the employee is unable to or does not return to work at the end of 12 weeks of FMLA

leave (provided the employer designated the leave as FMLA leave and so notified the employee in

writing), all entitlements and rights under FMLA cease at that time").

Although Plaintiff now claims that she had no notice that her FMLA leave would expire,

Ms. Devine acknowledges that by her own calculations, her FMLA leave was set to expire on May

11, 2007 – weeks before she returned to work.  Indeed, Ms. Devine's testimony reveals that

Plaintiff was acutely aware of the amount of leave she was entitled to and  was in constant

communication  with Prudential regarding her leave and the manner in which she could take such

leave.  There is no dispute that Plaintiff was aware that twelve weeks of her extended leave were

designated as FMLA leave.[23]  Thus, granting all inferences to Plaintiff, the Court finds that

Plaintiff took her twelve weeks of FMLA leave prior to returning to work, and therefore, Plaintiff

---

[23]From October 2001 to July 2002, Prudential provided Plaintiff with short term
disability, long term disability, FMLA, parental leave, and vacation benefits.

was no longer protected under the FMLA when she returned to the 740 Office.

Even if the FMLA strictures applied to Plaintiff upon her return to work, I do not find that Plaintiff has established a violation of the Act sufficient to survive summary judgment. The FMLA's protections should not be used as "sharpening stones on which to grind personal axes." Noyer v. Viacom Inc., 22 F.Supp.2d 301, 308 (S.D.N.Y. 1998). As such, the "requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis or intangible, unmeasurable aspects of the job." 29 CFR § 825.215(f); see also Noyer, 22 F.Supp.2d at 302, 308 (former Senior Vice President of Communications failed to state a FMLA claim when she claimed that as result of her maternity leave she was kept uninformed of everything on one of her projects and felt "ill-used" by her employer). Courts have found "de minimis or intangible, unmeasurable aspects of the job" to include a change in office space upon an employee's return from leave. See Montgomery v.Maryland, 266 F.3d 334, 341-42 (4th Cir. 2001) vacated on other grounds, 535 U.S. 1075 (2002) (court found that employer had not violated the FMLA when upon return from leave the employee no longer had her own office and had to share space); Hillstrom v. Best Western TLC Hotel, 265 F.Supp.2d 117, 127 (court "cannot believe that Congress, in enacting the FMLA, intended to make a federal case out of office space").

Similar to Ms. Devine, the plaintiff in Montgomery claimed that her employer violated the FMLA when it took "her own work area" away upon her return from leave and required her to now "work in a room shared with another employee" although her compensation remained the same. Montgomery, 266 F.3d at 341. The Fourth Circuit found "the sharing of work space" to "fall within the excluded de minimis category" under the FMLA. Id. at 342. The Circuit opined

60

that "the difference between having one's own work space and having to share space with one other person is not of such import as to implicate the protections of the governing federal law." Id. Accordingly, the Circuit held that the plaintiff's employer did not violate the FMLA by requiring the plaintiff to share an office upon her return from leave. Id.

Other examples of "de minimis" and "intangible" aspects of an employee's job include:

- an employer's decision to no longer require its Assistant Supervisor of School Accounts "to travel to the various schools of the district and work directly with principals and their staffs." Smith v. East Baton Rouge Parish School Board, 453 F.3d 650, 65-52 (5th Cir. 2006);

- comments made by supervisors that employee "did not fit in," employee not given keys to her place of employment, employee not invited to a manager's meeting, and employee's work product was discarded. Tanganelli v. Talbots, Inc., 169 Fed. Appx. 123, 125-27 (3d Cir. 2006).

For the reasons stated above, see also pp. 40-54, supra, no reasonable fact-finder could view any changes Plaintiff experienced after she returned to work as anything more than "intangible" or "de minimis" departures from her pre-leave job. Thus, the Court finds that, as a matter of law, Plaintiff has failed to state a violation under the FMLA, that Prudential went above and beyond to accommodate and grant Plaintiff's leave requests, and provided Plaintiff with over eight months of leave.

It is appropriate to note that the Court's holding here is limited to the specific facts in the instant case. Although the Court finds June 27, 2007the out of circuit precedent, that a change in office space falls under the de minimis category, persuasive, the Court is aware that there may be

61

cases  where a change in office space falls outside of the de minimis category and a Court could find a FMLA violation based on a significant change in an employee's working conditions.  But that is not the case here, and the Court simply cannot find that an alleged change in Plaintiff's office, a converted lunchroom, falls outside of the de minimis category.  Equally compelling, the Court points out that the facts, as alleged by Plaintiff, do not support that Plaintiff would not have been able to occupy her office.  At best, Plaintiff's argument that there would have been a change in the configuration of the 740 Office is speculative given that Plaintiff never physically entered the 740 Office after December 2001 or January 2002, and voluntarily resigned before giving Prudential an opportunity to address her office concerns.

### C.    Plaintiff's LAD and FMLA Claims Against John Horlsey

In his Motion for Summary Judgment, Defendant John Horlsey joined "in the legal arguments set forth in the brief filed by defendant Prudential in support of its motion for summary."  Horsley Br. at 1.  According to Mr. Horsley, Prudential's arguments "apply equally to plaintiff's claims against Mr. Horsley and merit summary judgment in his favor."  Id.  However, in addition to Prudential's arguments, Mr. Horsley raises "two additional arguments . . . which also justify summary judgment in favor of Mr. Horsley."  Id.

With regard to Plaintiff's LAD claim, Mr. Horsley argues that Plaintiff's LAD claim against him must be dismissed because in the context of LAD claims "[i]ndividual liability attaches only if the individual employee is the aggrieved employee's supervisor or manager."  Id. at 3.  Since Mr. Horsley was never Plaintiff's supervisor or manager, Mr. Horsley argues that he "cannot be held liable under the NJLAD."  Id.  With regard to Plaintiff's FMLA claim, Mr. Horsley argues that Plaintiff has "no basis for individual liability against" him because he did not

"'exercise control' over [Plaintiff's] ability to take FMLA leave." Id. at 2.  Plaintiff failed to

address these specific arguments in her October 5, 2006 opposition brief to Prudential and Mr.

Horsley's Motions for Summary Judgment.

      Although the Court need not reach these issues since the Court has already concluded, for

the reasons stated above, that Plaintiff has failed to establish causes of action under the LAD and

FMLA, the Court agrees with Mr. Horsley and finds that even if Plaintiff had viable claims against

Prudential with regard to her LAD and FMLA claims, there is no basis for individual liability

against Mr. Horsley under those Acts.  "[N]on-supervisory employees are not liable" under New

Jersey's Law Against Discrimination, and therefore, only LAD suits against employers and

supervisory employees may be brought.  Tyson v. Cigna Corp., 918 F.Supp. 836, 841, 842 (D.N.J.

1996); see also Hurley v. Atlantic City Police Department, 174 F.3d 95, 126 (3d Cir. 1999) (only

"[a] supervisor, under New Jersey law, has a duty to act against harassment . . .  When a supervisor

flouts this duty, he subjects himself and his employer to liability").  "Permitting suits against

individual employees . . . does little to advance the purpose of the statute and imposes an

unacceptably large burden on the individual employees and the courts." Id. at 842.

      Similarly, in the context of the FMLA, only individuals who "exercise control" over the

employee's FMLA leave can be held liable for an employer's FMLA violations.  Kilvitis v. County

of Luzerne, 52 F. Supp. 2d 403, 412-413 (M.D.Pa. 1999); see also Hewett v. Willingboro Board of

Education, 421 F. Supp. 2d 814, 817-818, n.4 (D.N.J. 2006)  (individual employees in the public

and private sectors can be liable for FMLA violations if they are acting on behalf of the employer).

      Here, Plaintiff testified that Mr. Horsley was never her supervisor while she was

employed with Prudential.  Further, Plaintiff has no evidence or proof to refute Mr. Horsley's

statement that "it is undisputed that [he] was merely a co-employee of plaintiff," he was not

Plaintiff's manager, nor did he exercise "control over [Plaintiff's] FMLA leave.  Accordingly, the

Court finds that there is no basis for individual liability against Mr. Horsley under the LAD and

FMLA.

### E.    Plaintiff's Intentional Infliction of Emotional Distress Claims Against Prudential and John Horsley

Plaintiff also asserts a claim for intentional infliction of emotional distress arising out of

the events surrounding Plaintiff's resignation.  New Jersey recognizes the tort of intentional

infliction of emotional distress. In order to recover for such a claim, "the plaintiff must establish

intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe."

Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 22 (App.Div. 2001).  "Generally, it is rare

to find conduct in the employment context which will rise to the level of outrageousness necessary

to provide a basis for recovery on a claim of intentional infliction of emotional distress."  Harris v.

Middlesex County College, 353 N.J.Super. 31, 46 (App .Div.2002) (citations and internal

quotations omitted).

Specifically, New Jersey courts have held that to establish a claim for intentional

infliction of emotional distress, a plaintiff must initially:

> prove that the defendant acted intentionally or recklessly. For an
> intentional act to result in liability, the defendant must intend both to
> do the act and to produce emotional distress. Liability will also attach
> when the defendant acts recklessly in deliberate disregard of a high
> degree of probability that emotional distress will follow. Second, the
> defendant's conduct must be extreme and outrageous. The conduct
> must be "so outrageous in character, and so extreme in degree, as to
> go beyond all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized community." Third, the
> defendant's actions must have been the proximate cause of the

> plaintiff's emotional distress. Fourth, the emotional distress suffered
> by the plaintiff must be "so severe that no reasonable man could be
> expected to endure it."

<u>Griffin</u>, 337 NJ Super. at 22-23 (citations omitted).

The conduct needed to support a claim for intentional infliction of emotional distress must be "so extreme and outrageous 'as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community.'" <u>Zamboni v. Stamler</u>, 847 F.2d 73, 80 (3d Cir. 1988) (quoting <u>Hume v. Bayer</u>, 178 N.J. Super 310, 314-15 (Law Div. 1981)). Accordingly, "New Jersey courts have recognized a claim for intentional infliction of emotional distress" in such outrageous cases as the following: (1) "a physcian knowingly and untruthfully told parents their son was suffering from cancer"; and (2) "a hospital was unable to locate the body of dead baby for three weeks . . . ." <u>Id.</u> (citing <u>Hume</u>, at 310; <u>Muniz v. United Hospitals Medical Center</u>, 153 N.J. Super. 79 (App. Div. 1977)).  Although the Third Circuit in <u>Zamboni</u> noted that "petty vindictive behavior by an employer can wreak havoc on vulnerable employees," the Third Circuit found that the "conduct alleged [by the plaintiff in <u>Zamboni</u>] did not rise to the level required for the tort of intentional infliction of emotional distress."  <u>Id.</u>

In the instant matter, Plaintiff has not set forth any facts that would suggest that the Defendants intended to produce emotional distress or that the conduct was so extreme and outrageous that it was beyond bounds of decency.  For these reasons, the Court grant Defendants' Motion on Plaintiff's claim of Intentional Infliction of Emotional Distress.

### F.____Plaintiff's Claim for Punitive Damages

In view of the Court granting Defendants' Motions for Summary Judgment, the Court need not address Defendants' argument that punitive damages are not warranted here.

**G.      Plaintiff's Motion for Summary Judgment and Cross-Motion for Spoliation**

In her September 8, 2005 submission to the Court, Plaintiff purports to move for summary judgment and  seeks a dismissal or default judgment based on Prudential's alleged "spoliation of evidence for willful conduct."  See Pl. Br.  However, upon careful review of Plaintiff's brief, it appears that Plaintiff merely set forth her theory of the case and the facts she alleges support her allegations.  Moreover, she failed to submit a Rule 56.1 Statement of Undisputed Material Facts in support of her Motion.  For all the reasons stated in this Opinion, as well as the foregoing, Plaintiff has failed to establish that the facts support judgment on her behalf.

On September 21, 2006, Plaintiff filed a Cross-Motion for Spoliation of Evidence.  See Pl. Cross-Motion  In this Motion, Plaintiff again sets forth facts she alleges support her allegations and again asks the Court to grant default judgment against the Defendant for allegedly failing to produce the following: (1) the 2002 lease Plaintiff allegedly entered into with Mr. Horsley; (2) "email communications detailing how the second Leasehold Agreement occurred"; (3) emails pertaining to Plaintiff's FMLA pregnancy/maternity leave; and (4) "email communications from October 31, 2001to the very time [Plaintiff] was instructed not to use her laptop" that allegedly reveal Plaintiff's concerns that her private office space was being taken over by David Chapman. Id. at 4-5.

First, the Court notes that default judgment is not appropriate here as there is no Order pending before this Court that Defendants have failed to comply with.  Second, Plaintiff's Motion for Summary Judgment is now moot because the Court, as discussed above, has found that Plaintiff's allegations, granting all inferences to Plaintiff on Defendants' Motions, cannot support her claims under the LAD, FMLA, or a cause of action for the intentional infliction of

emotional distress.  With regard to Plaintiff's September 21, 2006 Cross-Motion for Spoliation, the Court finds that this Motion is also moot, and accordingly, the Court denies the Cross-Motion. However, the Court notes that for purposes of this Opinion, the Court has accepted Plaintiff's version of the facts to be true.  In fact, in granting Defendants' Motions for Summary Judgment, I have assumed that Ms. Devine and Mr. Horsley entered into a second lease in 2002.  Further, I have accepted as true, all of Plaintiff's allegations which she contends would have been supported by allegedly "destroyed" email file evidence.  Finally, even if the Court were to find support for Plaintiff's spoliation claim, which it does not, at best, Plaintiff would only be entitled to "an adverse inference or other appropriate remedy during trial," as was noted in Judge Bongiovanni's December 7, 2005 Order.  But I have already given the Plaintiff the benefit of such an inference in this Motion.  See Dec. 7, 2005 Order (emphasis added).

Therefore, Plaintiff's motions are denied.

## IV.    CONCLUSION

For the forgoing reasons, Defendants' Motions for Summary Judgment on their claims against them are granted, and Plaintiffs' Motion for Summary Judgment and Cross-Motion Spoliation are denied.

An appropriate Order shall follow.


/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge


Date: June 27, 2007

67